COMMONWEALTH of Pennsylvania,
Appellee

v.

Jovon KNOX, Appellant.

Superior Court of Pennsylvania.

Argued May 18, 2010.
Filed July 16, 2012.
Reargument Denied Sept. 19, 2012.

Thomas N. Farrell, Pittsburgh, for appellant.

Michael W. Streily, Deputy District Attorney and Francesco L. Nepa, Assistant District Attorney, Pittsburgh, for Commonwealth, appellee.

Marsha Levick, Philadelphia, amicus curiae.

BEFORE: DONOHUE, OLSON and FITZGERALD*, JJ.

OPINION BY DONOHUE, J.:

Jovon Knox ("Knox") appeals from the judgment of sentence entered on September 23, 2008, following a jury trial at which Knox was convicted of second-degree felony murder, attempted robbery of a motor vehicle, conspiracy, and carrying a firearm without a license. Knox and his co-defendant, his identical twin brother, Devon Knox ("Devon"), were 17–years–old at the time they committed the crimes.[1] On appeal, Knox challenges the sufficiency of the evidence to support his convictions and the constitutionality of a life sentence without the possibility of parole for a juvenile convicted of second-degree murder. Although we determine that the evidence was sufficient to support his convictions, we remand for resentencing based the United States Supreme Court's decision in *Miller v. Ala-*

---

* Former Justice specially assigned to the Superior Court.

1. Devon Knox's direct appeal is pending before this Court at docket 801 WDA 2009.

*bama,* —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).

On July 8, 2007, at approximately 1:30 p.m., Jehru Donaldson ("the victim") drove his girlfriend to her sister's house on the North Side of Pittsburgh to pick up two of her nephews for a Pittsburgh Pirates baseball game. The victim waited outside in his car while his girlfriend went inside the house. Two of her nephews, Ah.C. and Aa.C. (ages 9 and 13, respectively), were outside at the time, and observed Knox and his twin brother approach the victim's car on the driver's side. One of the twins told the victim to "[g]et out of the car." N.T., 6/3/08, at 145. The same twin then lifted his shirt, exposed a gun, and again said to the victim: "Get out of the car." *Id.* at 147. When the victim did not comply, the same twin pulled out the gun and aimed it at the victim's head. The victim pushed the gun away from his face with his hand and drove off. Both twins ran towards the car, and the twin with the gun fired one shot towards the victim's car. After the shot was fired, the victim crashed his vehicle into an abandoned house, at which point both twins ran together up the street, away from the victim's car.

In the hours that followed the shooting, Ah.C. and Aa.C. spoke with police about what they observed. Both Ah.C. and Aa.C. identified the twins in photo arrays as being the two individuals who approached the victim's car, and further identified Devon as the shooter.

The victim was rushed to Allegheny General Hospital and was pronounced dead the following afternoon, on July 9, 2007. The cause of death was a single gunshot wound to the head.

That same day, United States Marshals secured a warrant for the arrest of Knox and his twin brother. Upon arriving at the Knox residence, the twins' father informed the marshals that he was preparing to send his daughter out of town for fear of retaliation against his sons. He told the marshals that Knox and his brother were staying with a girlfriend, and provided the address where the twins were later apprehended.

Knox was taken to the police station, where he was provided his *Miranda*[2] rights and interrogated by the police. Knox told police that he was not in the area where the shooting occurred on the day in question, but could not say whom he was with or where he was.[3]

Knox was charged with criminal homicide, attempted robbery of a motor vehicle, conspiracy to commit robbery of a motor vehicle, and possession of a firearm without a license.[4] He was tried jointly with Devon. The Commonwealth proceeded on the theory that Devon was the shooter, and Knox his accomplice and co-conspirator.[5] Knox's defense was that Devon was the perpetrator of the crimes, and that he

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** Devon likewise told police he was not at the location of the shooting on the day in question. Rather, he said he was with a friend whose name he did not know. Devon told police he met up with this unnamed person on the North Side of Pittsburgh, traveled to the West End and to Mount Oliver, and then he returned to a girlfriend's house, where he was subsequently arrested.

**4.** 18 Pa.C.S.A. §§ 2501(a), 3702(a), 901(a), 903(a), 6106(a)(1).

**5.** The prosecutor argued to the jury, however, that it did not matter which defendant was the actual shooter, because under the theories of accomplice and co-conspirator liability, both are equally responsible for the victim's murder and the underlying crimes. *See* N.T., 6/9/08, at 431–35.

was merely an innocent bystander. On the first day of the trial, however, Knox and his twin brother, who were dressed identically, switched places in what the trial court referred to as "a courtroom stunt reminiscent of 'The Parent Trap[.]'" Trial Court Opinion, 6/22/09, at 2; *see* N.T., 6/3/08, at 156–57, 185–93.[6] At the time the brothers engaged in this switch, Ah.C. testified and identified Knox as the shooter.

The jury acquitted Knox of first-degree murder,[7] but convicted him of second-degree murder,[8] attempted robbery of a motor vehicle, conspiracy, and carrying a firearm without a license. The jury did not make a finding regarding which brother was the shooter. The trial court sentenced Knox to the mandatory sentence for second-degree murder—life in prison without the possibility of parole [9]—and imposed no further penalty on the other convictions.

Trial counsel was permitted to withdraw, and the trial court appointed new counsel. The trial court granted an extension of time for Knox to file post-sentence motions so that new counsel could obtain the trial transcripts. Thereafter, Knox filed a post-sentence motion asserting that the verdict was against the weight of the evidence. This motion was denied on March 12, 2009.

Knox filed a notice of appeal on April 3, 2009. He timely complied with the trial court's order to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b). The trial court filed a responsive opinion pursuant to Pa.R.A.P. 1925(a). On appeal, Knox raises the following issues for our review:

1. Whether there was sufficient evidence to support the convictions of second-degree murder, criminal attempt (robbery of a motor vehicle), criminal conspiracy (robbery of a motor vehicle), and carrying a firearm without a license when the Commonwealth failed to prove beyond a reasonable doubt that [Knox] was a conspirator and/or an accomplice, and only proved [Knox] was merely present during a robbery/homicide?

2. Whether there was sufficient evidence to support the conviction of carrying a firearm without a license when the Commonwealth failed to prove beyond a reasonable doubt that [Knox] carried a firearm, and the evidence at trial demonstrated that [Devon] possessed the gun at all times?

3. Whether the life sentence without the possibility of parole for a juvenile is unconstitutional under the Eighth Amendment of the United States Constitution as well as Article

---

6. Once this was discovered, the trial court adjourned to have both defendants re-fingerprinted and re-braceleted, as one of the Knox twins was missing his identification bracelet, and it was unknown whether the brothers had switched bracelets at any time. The twins were subsequently housed and transported separately, and assigned their own sheriff's deputy to ensure they could not again switch places.

7. 18 Pa.C.S.A. § 2502(a).

8. 18 Pa.C.S.A. § 2502(b).

9. The mandatory sentence for a person convicted of second-degree murder is life in prison, and does not specify whether an individual so convicted is eligible for parole. *See* 18 Pa.C.S.A. § 1102(b). The Legislature, however, has prohibited the Parole Board from granting parole to an inmate sentenced to life in prison, creating a mandatory sentence of life in prison without the possibility of parole for individuals convicted of second-degree murder. *See* 61 Pa.C.S.A. § 6137(a)(1).

I, Section 13 of the Pennsylvania Constitution?

Knox's Brief at 4.

■ In his first issue raised on appeal, Knox challenges the sufficiency of evidence to prove that he conspired with Devon to commit the crimes perpetrated against the victim, or that he was Devon's accomplice in the commission of the crimes.[10] *Id.* at 17. He argues that the Commonwealth established only that he "was merely present," with no evidence that he aided or intended to aid Devon in the commission of the crimes. *Id.* at 17, 21. In anticipation of the Commonwealth's argument that Knox did not leave the scene when he saw Devon had a gun, he explains that "[h]e didn't have time to leave. Both [Ah.C.] and [Aa.C.] admitted that they could not run into their house and get help from an adult when they saw Devon with the gun because the event happened so very quickly." *Id.* at 22.

Our standard for reviewing the sufficiency of the evidence is as follows:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder

unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Brown,* 23 A.3d 544, 559–60 (Pa.Super.2011) (*en banc*).

We begin by setting forth the definitions of the relevant crimes. "A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. § 901(a). The statute defining robbery of a motor vehicle provides: "A person commits a felony of the first degree if he steals or takes a motor vehicle from another person in the presence of that person or any other person in lawful possession of the motor vehicle." 18 Pa.C.S.A. § 3702(a).

"A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony." 18 Pa.C.S.A. § 2502(b). "Perpetration of a felony" is defined as: "The act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after

---

**10.** In his second issue raised on appeal, Knox challenges the sufficiency of the evidence to convict him of carrying a firearm without a license. Knox's Brief at 30–36. We therefore only address the sufficiency of the evidence regarding his convictions for second-degree murder, attempted robbery of a motor vehicle, and conspiracy in this portion of the Opinion.

committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping." 18 Pa.C.S.A. § 2502(d).

 The Pennsylvania Crimes Code defines conspiracy as follows:

A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

18 Pa.C.S.A. § 903(a). This requires proof that: 1) the defendant entered into an agreement with another to commit or aid in the commission of a crime; 2) he shared the criminal intent with that other person; and 3) an overt act was committed in furtherance of the conspiracy. *Commonwealth v. Devine*, 26 A.3d 1139, 1147 (Pa.Super.2011). "This overt act need not be committed by the defendant; it need only be committed by a co-conspirator." *Commonwealth v. Murphy*, 795 A.2d 1025, 1038 (Pa.Super.2002) (citation omitted).

The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators in furtherance of the conspiracy.

*Commonwealth v. McCall*, 911 A.2d 992, 996–97 (Pa.Super.2006) (citation omitted).

 An accomplice is also legally accountable for the conduct of the other person involved in committing the crimes. 18 Pa.C.S.A. § 306(b)(3). The Crimes Code defines an accomplice as follows:

A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it; or

(2) his conduct is expressly declared by law to establish his complicity.

18 Pa.C.S.A. § 306(c). "Both requirements may be established wholly by circumstantial evidence. Only the least degree of concert or collusion in the commission of the offense is sufficient to sustain a finding of responsibility as an accomplice. No agreement is required, only aid." *Commonwealth v. Kimbrough*, 872 A.2d 1244, 1251 (Pa.Super.2005) (*en banc*) (citations and quotations omitted). "[P]roof of a criminal partnership is almost invariably extract-

ed from the circumstances that attend its activities." *Id.* at 1253–54 (citation omitted).

> To establish complicity, mere presence at the scene of a crime and knowledge of the commission of criminal acts is not sufficient. Nor is flight from the scene of a crime, without more, enough. However, those factors combined, along with other direct or circumstantial evidence may provide a sufficient basis for a conviction, provided the conviction is predicated upon more than mere suspicion or conjecture.

*Commonwealth v. Rosetti,* 322 Pa.Super. 536, 469 A.2d 1121, 1123 (1983) (citations omitted).

In the instant matter, the trial court found:

> Contrary to [Knox's] version of the facts, the evidence presented at trial established that [Knox] acted in concert with his brother in the robbery of [the victim's] car. [Knox] purposefully approached the car with his brother, blocked the door of the car so [the victim] could not escape and made no efforts to leave when his brother pulled out the gun. Once his brother had fired the gun, [Knox] fled with him, hid with him and lied to the police regarding his whereabouts at the time of the crime. This 'web of evidence' was more than sufficient to permit an inference that [Knox] was acting as part of a criminal partnership with his brother.

Trial Court Opinion, 6/22/09, at 4.

At trial, Ah.C. and Aa.C. both testified that they were sitting outside when the victim arrived in his car. N.T. 6/3/08, at 130–31, 273. They each stated that they saw Knox and his twin brother walk up to the victim's vehicle and stand by the driver's side door, side-by-side. *Id.* at 137, 140–43, 278–81, 290. Ah.C. recognized "the twins" because he had seen them on the street and they had visited his house to have their hair cut by Ah.C.'s father. *Id.* at 137–38. Ah.C. heard one of the brothers say to the victim: "Get out of the car." *Id.* at 145. When the victim refused, Ah.C. saw the same brother pull up his shirt, revealing a gun, and again tell the victim: "Get out of the car." *Id.* at 146–47. Ah.C. then observed the same brother pull out the gun and point it at the victim's head through the open car window. *Id.* at 148. The victim brushed the gun aside with his hand and drove the vehicle away. *Id.* at 148–49. Ah.C. stated that both brothers moved in the direction of the car, and the brother with the gun, still brandishing it, fired one shot. *Id.* at 150–51. The car crashed, and both brothers ran up the block together and around the corner. *Id.* at 151–52.

Similarly, Aa.C. testified that the brothers were side-by-side at the car, but Aa.C. could not hear everything that was being said. He saw the victim shaking his head, "no," and he heard the brother who eventually produced the gun tell the victim to "get out." N.T., 6/4/08, at 282–84. When the victim drove off, Aa.C. likewise observed both brothers run after the car together, and the brother with the gun shoot towards the car. *Id.* at 285–86. Once the car crashed into the abandoned house, Aa.C. testified that both brothers ran together away from the car and around the corner. *Id.* at 288.

Later that day, Ah.C. and Aa.C. spoke with police. Each identified the Knox brothers in a photographic array as the two individuals who approached the victim's car, and identified Devon as the person who fired the gun.[11] N.T., 6/9/08, at 363.

11. Aa.C. lived in a different neighborhood with his grandmother, and did not know ei-

United States Marshal Robert Holtz testified that the day after the shooting, he spoke with the Knox brothers' father. N.T., 6/4/09, at 251. The father stated his fear that there would be retaliation against the twins. *Id.* at 251–52. He informed the marshal that the twins were staying with a girlfriend, and provided an address where they were subsequently apprehended. *Id.* at 255–56.

Knox spoke with police, but denied being in the area where the shooting occurred on the day in question. *Id.* at 331–32. He could not say whom he was with or where he was at the time the shooting occurred. *Id.* at 333–34.

Based upon our review of the record, we agree with the trial court that the evidence was sufficient to establish that Knox assisted Devon and participated in the attempt to rob the victim of his vehicle. Knox approached the vehicle with his brother and stood with him at the car door, contributing to the intimidation of the victim. Although Knox argues that "he didn't have time to leave" upon seeing the gun, he ignores Ah.C.'s and Aa.C.'s testimony that he moved **with** Devon toward the victim's car as the victim attempted to drive away. Knox further fails to acknowledge the evidence that he ran away with Devon after the shooting and hid with him at a girlfriend's home. Upon arrest, he lied to the police, denying that he was at the scene.

The evidence, viewed in the light most favorable to the Commonwealth, established that Knox shared a criminal intent with Devon, and that they had "a common understanding [ ... ] that a particular criminal objective be accomplished." *McCall*, 911 A.2d at 996. One twin committed overt acts in furtherance of the conspiracy: he ordered the victim to get out of the car, pointed a gun at the victim's head, and shot the victim. These actions were imputed to Knox regardless of whether he was the twin who did the shooting. *See id.* at 997; 18 Pa.C.S.A. § 306(b). Accordingly, we find sufficient evidence to support Knox's conspiracy conviction and his convictions of second-degree murder and attempted robbery of a motor vehicle based upon conspirator and accomplice liability. *See* 18 Pa.C.S.A. §§ 306(b), (c), 3702(a), 901(a), 903(a)(1), 2502(b).

As his second issue on appeal, Knox argues that the evidence was insufficient to convict him of carrying a firearm without a license. Knox's Brief at 30. He asserts that because the evidence demonstrates that only Devon possessed a firearm, the conviction cannot stand. *Id.* at 32. The trial court concedes that the evidence was insufficient to convict Knox of having possessed the firearm himself, but states that the evidence was sufficient to convict him of carrying a firearm without a license based upon conspirator liability. Trial Court Opinion, 6/22/09, at 7. Knox counters that the trial court's determination was made in error, as he was not charged with conspiracy to possess a firearm without a license, and thus cannot lawfully be convicted of the crime.[12] Knox's Brief at 34–35.

ther of the Knox brothers prior to seeing them on the day in question. He testified that they did not have anything covering their faces when he saw them approach the victim's car. N.T., 6/4/08, at 279.

12. For the first time on appeal, Knox raises the argument that he cannot be convicted of conspiracy to possess a firearm without a license because he was never charged with the offense. Typically, his failure to raise the argument before the trial court would result in waiver of this claim. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). The law is clear, however, that

Knox is correct that a defendant cannot be convicted of a crime for which he was not charged. *See Speller*, 458 A.2d at 203. Knox is also correct that he was not charged with conspiracy to carry a firearm without a license. *See* Criminal Complaint, 7/25/07; Criminal Information, 9/26/07. The record reflects, however, that Knox was not convicted of **conspiracy** to carry a firearm without a license; he was convicted of **carrying** a firearm without a license, a crime for which he was charged. *See* Verdict, 6/9/08; Criminal Information, 9/26/07. Therefore, this argument lacks merit.

The record reflects that the jury was not asked to determine which twin was in possession of the firearm. Indeed, during its closing argument, the Commonwealth stated it did not matter which of the defendants was in possession of the firearm, as both were equally culpable for the actions of the other. *See* N.T., 6/9/08, at 431–35. As stated *supra*, the record reflects that both eyewitnesses to the shooting repeatedly identified Devon as the one in possession of the firearm. The only time Knox was identified as having been the shooter was during the testimony of 10–year–old Ah.C., which occurred when the Knox brothers switched places in an obvious attempt to confuse the child. *See* N.T., 6/3/08, at 155–57. Ah.C. subsequently testified, however, that he could tell the twins apart because "one of them is lighter [skinned]." N.T., 6/3/08, at 159. He stated that the "lighter" twin is the one who had the gun. *Id.* This reasoning was echoed by Aa.C., who identified Devon as the shooter. N.T., 6/4/08, at 296. Furthermore, the Commonwealth's theory of the case was that Devon, not Knox, was in possession of the firearm. *See* N.T., 6/3/08

at 20; N.T., 6/9/08, at 434. We therefore agree that the evidence was not sufficient to prove that Knox actually possessed the firearm.

Our Supreme Court has stated, however, that a defendant can be legally responsible for the illegal possession of a firearm under a theory of accomplice liability. *See Commonwealth v. Smith*, 490 Pa. 329, 333–34, 416 A.2d 494, 496–97 (1980). In *Smith*, the defendant engaged in several fistfights throughout a single day, first with Leon Mayo ("Mayo"), and later with Jerry Crew ("Crew"). The defendant and his friends confronted Mayo and his friends at West Philadelphia High School, where the defendant informed Mayo he wanted to continue fighting with Crew. When Mayo said that Crew did not want to fight anymore, the defendant ran to the corner where one of his friends stood, and shouted "now, now." *Id.* at 333, 416 A.2d at 496. At that, the defendant's friend fired a shot from a gun, killing one of Mayo's friends. *Id.*

The defendant was convicted of third-degree murder, conspiracy, possessing an instrument of crime, and illegal possession of a firearm. On appeal, he contested, *inter alia*, the sufficiency of the evidence to support his conviction for possession of the firearm. Our Supreme Court affirmed, finding that the circumstances surrounding the shooting warranted a finding of accomplice liability for the firearms offense. *Id.* at 334, 416 A.2d at 497.

As stated above, the totality of the evidence presented in the case at bar, viewed in the light most favorable to the Commonwealth, supports a finding that Knox acted as Devon's accomplice in committing the

---

a court is without jurisdiction to convict a defendant of a crime for which he was not charged, *Commonwealth v. Speller*, 311 Pa.Super. 569, 458 A.2d 198, 203 (1983), and

a challenge to a court's subject matter jurisdiction is not waivable. *Commonwealth v. Shamsud–Din*, 995 A.2d 1224, 1228 (Pa.Super.2010).

crimes on July 8, 2007.[13] The combination of Knox's presence at the scene, standing side-by-side with Devon as one of the twins pulled a gun on the victim, running with Devon toward the car as one of them shot at the victim, fleeing the scene with Devon, hiding at a girlfriend's house afterwards, and lying to police about his whereabouts on the day in question, give rise to the conclusion that Knox acted as Devon's accomplice. *See* 18 Pa.C.S.A., § 306(c); *Kimbrough*, 872 A.2d at 1251, 1253–54; *Rosetti*, 469 A.2d at 1123. Therefore, Knox and Devon are criminally responsible for each other's actions, and Knox was properly convicted of possessing a firearm without a license. *See* 18 Pa.C.S.A. § 306(b)(3); *Smith*, 490 Pa. at 334, 416 A.2d at 497.

▮▮▮▮ As his final issue on appeal, Knox argues that a mandatory sentence of life in prison without the possibility of parole for a juvenile convicted of second-degree murder via accomplice liability is unconstitutional pursuant to Eighth Amendment of the United States and Article I, Section 13 of the Pennsylvania Constitution.[14] Knox's Brief at 37–38. He indicates that he raised this issue in anticipation of the United States Supreme Court deciding the cases of *Graham v. Florida*, ── U.S. ──, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010), and *Sullivan v. Florida*, ── U.S. ──, 130 S.Ct. 2059, ── L.Ed.2d ── (2010).[15] Knox's Brief at 38. The trial court and the Commonwealth contend that the resolution of this issue is controlled by this Court's decision in *Commonwealth v. Carter*, 855 A.2d 885 (Pa.Super.2004), *appeal denied*, 581 Pa. 670, 863 A.2d 1142 (2004). *See* Trial Court Opinion, 6/22/09, at 8–9; Commonwealth's Brief at 25.[16]

In *Carter*, the juvenile appellant, who was sentenced to life in prison without parole for second-degree murder, filed a timely petition pursuant to the Post Conviction Relief Act ("PCRA") alleging, *inter*

---

**13.** The trial court charged the *Knox* jury on accomplice liability. *See* N.T., 6/9/04, at 465–66.

**14.** The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII.

To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society. This is because the standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change.

*Graham v. Florida*, ── U.S. ──, 130 S.Ct. 2011, 2021, 176 L.Ed.2d 825 (2010) (internal citations and quotations omitted). The Eighth Amendment's prohibition of cruel and unusual punishment is not a constant and must continually evolve to reflect the changes in society. *Miller v. Alabama*, ── U.S. ──

── , 132 S.Ct. 2455, 2463, 183 L.Ed.2d 407, ── (2012). Article 1, Section 13 of the Pennsylvania Constitution states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted." PA. CONST. art. I, § 13. This Court has interpreted Pennsylvania's prohibition of cruel punishment to be coextensive with the Eighth and Fourteenth Amendments of the United States Constitution. *See Commonwealth v. Yasipour*, 957 A.2d 734, 743 (Pa.Super.2008). "Therefore, the Pennsylvania Constitution affords no broader protection against excessive sentences than that provided by the Eighth Amendment to the United States Constitution." *Id.*

**15.** The writ of *certiorari* in *Sullivan* was dismissed as having been improvidently granted. *Sullivan*, 130 S.Ct. at 2059.

**16.** "As the constitutionality of a statute is a pure question of law, our standard of review is de novo and our scope of review is plenary." *Commonwealth v. Omar*, 602 Pa. 595, 605, 981 A.2d 179, 185 (2009).

*alia,* ineffective assistance of counsel. Specifically, he asserted that "counsel failed to recognize, assert and preserve a constitutional challenge to the applicability, propriety and legality of a mandatory life sentence without parole imposed upon a juvenile convicted of felony-murder." *Carter,* 855 A.2d at 888. The panel in *Carter* stated that this Court had not previously decided the constitutionality of a life sentence without the possibility of parole for a juvenile offender. The Court noted, however, that the Pennsylvania Supreme Court, in *Commonwealth v. Williams,* 514 Pa. 62, 522 A.2d 1058 (1987), had addressed a related issue of "whether the Juvenile Act violate[d] substantive due process by 'creating an impermissible presumption that juveniles accused of murder would be treated as adults.'" *Carter,* 855 A.2d at 892 (quoting *Williams,* 514 Pa. at 71, 522 A.2d at 1062). Based upon *Williams'* conclusion that there is "no constitutional guarantee of special treatment for juvenile offenders," the *Carter* Court held that "age does not entitle [the appellant] to differential treatment." *Id.* at 892 (quoting *Williams,* 522 A.2d at 1063). Because a sentence of life imprisonment imposed upon an adult convicted of felony murder was not cruel and unusual punishment, the *Carter* Court concluded that it was an appropriate sentence for a juvenile who had been convicted of an identical crime. *Id.*

▪ While Knox's appeal was pending before this Court, the Supreme Court decided *Graham v. Florida.* In that case,

Terrance Graham ("Graham") was involved in two robberies in the course of a single night. *Id.* at 2019–20. The trial court found Graham guilty of armed burglary and attempted armed burglary. *Id.* at 2020. Because this was not Graham's first offense, the court sentenced him to the maximum sentence authorized—life imprisonment without the possibility of parole. *Id.* Graham filed a motion arguing that his judgment of sentence was unconstitutional under the Eighth Amendment. *Id.* The trial court denied Graham's motion and the Florida District Court of Appeal affirmed that decision. *Id.* The United States Supreme Court granted *certiorari* and reversed, holding that a life sentence without the possibility of parole imposed on a juvenile offender convicted of a non-homicide offense was categorically unconstitutional.[17] *Id.*

Examining statistics from the several states regarding the number of jurisdictions (39) that allowed a juvenile convicted of a non-homicide offense to be sentenced to life imprisonment without parole, and the rarity in which the sentence is imposed (123 juveniles serving the sentence for non–homicide crimes in the United States), the Supreme Court determined that there is a national consensus against the sentencing practice. *Id.* at 2023–26.

Relying on its findings in *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (holding that the death penalty is unconstitutional as applied to juvenile defendants), it found that "because juveniles have lessened culpability,

---

**17.** A categorical or "as-applied" attack on a statute's constitutionality under the Eighth Amendment requires the following analysis:

The Court first considers objective indicia of society's standards, as expressed in legislative enactments and state practice to determine whether there is a national consensus against the sentencing practice at issue. Next, guided by the standards elaborated by

controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose, the Court must determine in the exercise of its own judgment whether the punishment in question violates the Constitution.

*Graham,* 130 S.Ct. at 2022 (internal citations omitted).

they are less deserving of the most severe punishments." *Graham*, 130 S.Ct. at 2026. It noted three key differences between juveniles and adults: (1) juveniles have "a lack of maturity and an underdeveloped sense of responsibility"; (2) juveniles are more vulnerable and susceptible to negative influences than adults; and (3) the juvenile's underdeveloped character. *Id.* (citation to *Roper* omitted). Because juveniles' personalities are still developing and capable of change, the Court found a sentence of life imprisonment without the possibility of parole was developmentally inappropriate:

> Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults. It remains true that '[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed.'

*Id.* at 2026–27 (internal citations omitted). "[I]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption. Accordingly, juvenile offenders cannot with reliability be classified among the worst offenders." *Id.* at 2026 (citation to *Roper* omitted).

The Supreme Court reiterated its previous finding that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." *Id.* at 2027. It thus concluded that a juvenile offender who did not kill or intend to kill has twice the diminished moral culpability of an adult offender. *Id.*

The *Graham* Court further recognized that life in prison without parole is a harsh sentence, especially for a juvenile, who will spend a greater percentage of his life in prison than will an adult offender. *Id.* at 2028. The Court evaluated the penological goals (retribution, deterrence, incapacitation, and rehabilitation), and found that none justify a sentence of life in prison without the possibility of parole for a juvenile convicted of a non-homicide offense, making the sentence disproportionate to the offense. *Id.* It therefore held that a sentence of life imprisonment without the possibility of parole as applied to juveniles convicted of non-homicide offenses is cruel and unusual punishment in violation of the Eighth Amendment. *Id.* at 2034.

On June 30, 2011, this Court ordered Knox and the Commonwealth to file supplemental briefs addressing the United States Supreme Court's decision in *Graham*. Both of the parties and Knox's *amici*, the Juvenile Law Center, the Defender Association of Philadelphia, and several professors, timely filed supplemental briefs. Knox further filed a motion for the case to be heard by a panel *en banc* and for oral argument, which we denied by Order dated July 28, 2011.

In its supplemental brief, the Commonwealth continues to assert that this case is controlled by *Carter*, as *Graham* applies only to juveniles sentenced for non-homicide offenses, and Knox was convicted of homicide. Commonwealth's Supplemental Brief at 7–8. It further argues that the Superior Court already determined that *Graham* is inapplicable to juveniles convicted of homicide in another intervening case, *Commonwealth v. Ortiz*, 17 A.3d 417 (Pa.Super.2011).[18] Commonwealth's Supplemental Brief at 8–9.

---

18. The defendant in *Ortiz* filed an untimely PCRA petition in which he asserted a 42

Knox and his *amici* argue, *inter alia,* that the reasoning employed by the *Roper* and *Graham* Courts regarding a juvenile's reduced culpability is applicable to juveniles convicted of second-degree murder and sentenced to life in prison without the possibility of parole. Knox's Supplemental Brief at 43–47; *Amicus* Brief at 8–18. Both Knox and his *amici* distinguish the *Ortiz* case based upon the fact that *Ortiz* involved an appeal of the denial of post conviction collateral relief and was decided based upon the very narrow "timeliness" rules of the PCRA.[19] Knox's Supplemental Brief at 41–43; *Amicus* Brief at 6–7.[20]

Knox's *amici* present statistics evidencing a national consensus against the sentencing practice and a discussion regarding the absence of penological goals served by sentencing a juvenile to life without parole for second-degree murder, concluding that it is cruel and unusual punishment to sentence a juvenile to life in prison without the possibility of parole for felony murder. *Amicus* Brief at 18–26. *Amici* further argue that "the mandatory nature of Pennsylvania's life without parole sentencing scheme compounds its constitutional infirmity." *Id.* at 22–23. Knox incorporates the arguments of his *amici* as his own. Knox's Brief at 47.

On June 25, 2012, while Knox's appeal was still pending before this Court, the United States Supreme Court decided the companion cases of *Miller v. Alabama* and *Jackson v. Hobbs.* Each of those cases

---

Pa.C.S.A. § 9545(b)(1)(iii) exception, claiming that *Graham* created a new constitutional right for a juvenile sentenced to life without parole for second-degree murder. *Ortiz,* 17 A.3d at 421. The trial court dismissed Ortiz's petition as untimely and Ortiz appealed. This Court affirmed the decision of the lower court, stating:

> The ·Supreme Court in *Graham* limited its holding to life sentences without the possibility of parole that were imposed on juveniles for non-homicide crimes only, and did not consider the constitutionality of such a sentence for juveniles convicted of a homicide offense. Appellant committed a crime of homicide, and thus *Graham* does not apply. As such, Appellant's attempt to invoke an exception to the PCRA timeliness requirements by specifically relying upon *Graham* can afford Appellant no relief.

*Id.* at 421–22. In a footnote, the Court in *Ortiz* went on to say:

> [W]e note that a panel of this Court, in *Commonwealth v. Carter* specifically held that a life sentence for a juvenile offender convicted of second-degree murder does not violate the constitutional prohibition against cruel and unusual punishment. Therefore, unless and until the U.S. Supreme Court, the Pennsylvania Supreme Court, or the Pennsylvania Legislature concludes otherwise, we are bound by existing law holding that the imposition of a life sentence without the possibility of parole upon a juvenile convicted of a homicide offense is not cruel and unusual punishment.

*Id.* at 422 n. 7.

19. In order to satisfy the subsection (b)(1)(iii) exception to the PCRA's timeliness requirements, the right asserted must be a constitutional right that has been considered and **expressly** recognized by either the Pennsylvania Supreme Court or the United States Supreme Court after the one-year time limitation for filing a PCRA petition has passed, and that right must have been held to apply retroactively. 42 Pa.C.S.A. § 9545(b)(1)(iii); *Commonwealth v. Abdul–Salaam,* 571 Pa. 219, 226, 812 A.2d 497, 501 (2002).

20. We note that on September 26, 2011, after the parties filed their supplemental briefs, the Superior Court decided *Commonwealth v. Whitaker,* 30 A.3d 1195 (Pa.Super.2011), which was a direct appeal by a juvenile convicted of first-degree murder and sentenced to life in prison without the possibility of parole. The *Whitaker* panel did not engage in any of the constitutional analysis set forth by the Supreme Court in *Graham;* rather, the panel held, "[i]n light of *Ortiz* [ ], we find Appellant's claim that his sentence [of life in prison without the possibility of parole] constitutes cruel and unusual punishment is without merit." *Id.* at 1198.

involved 14–year–old defendants convicted of murder. In *Miller*, the defendant, Evan Miller ("Miller") and his friend, Colby Smith ("Smith"), accompanied the victim back to his trailer after the victim engaged in a drug deal with Miller's mother. *Miller*, 132 S.Ct. at 2462. The three smoked marijuana and drank alcohol until the victim passed out. *Id.* Miller took the victim's wallet and removed the $300.00 contained therein. *Id.* When he tried to return the wallet, the victim awoke and grabbed Miller by the throat. *Id.* Smith hit the victim with a baseball bat, and once released, Miller struck the victim repeatedly with the bat. Miller then placed a sheet over the victim's head, said: "I am G[-]d, I've come to take your life," and struck the victim with the bat again. *Id.* The boys left the victim's trailer, but returned soon thereafter to cover up the evidence by setting the trailer on fire. The victim died from his injuries and smoke inhalation. *Id.*

In *Jackson*, the defendant, Kuntrell Jackson ("Jackson") and two other boys decided to rob a video store. *Id.* at 2461. On the way to the store, Jackson learned that one of his cohorts was carrying a concealed sawed-off shotgun. *Id.* Jackson waited outside while the other two entered the store and demanded money from the clerk at gunpoint. *Id.* The clerk refused. *Id.* Jackson entered the store to find one of the boys continuing to demand money and either said to the clerk "we ain't playin'," or said to his friends "I thought you

all was playin'." *Id.* When the clerk threatened to call the police, the boy wielding the gun shot and killed her. *Id.* All three boys fled the scene. *Id.*

Both Miller and Jackson were convicted of murder and sentenced to life in prison without the possibility of parole pursuant to their states' mandatory sentencing schemes. *Id.* at 2460. The Arkansas Supreme Court affirmed Jackson's conviction;[21] the Alabama Court of Criminal Appeals affirmed Miller's conviction.[22] *Id.* at 2461–62. The United States Supreme Court granted *certiorari* in both cases and reversed, finding, in reference to a mandatory sentence of life without parole, that "[s]uch a scheme prevents those meting out punishment from considering a juvenile's 'lessened culpability' and greater 'capacity for change,' and runs afoul of our cases' requirement of individualized sentencing for defendants facing the most serious penalties." *Id.* at 2460 (internal citation to *Graham* omitted). It therefore concluded: "[M]andatory life without parole for those under the age of 18 at the time of their crimes violates the Eight Amendment's prohibition on 'cruel and unusual punishments.'" *Id.*

In arriving at this holding, the Court relied on two separately developed lines of its proportionate punishment precedent. First, it considered *Roper* and *Graham*—cases concerning categorical bans on sentencing practices that focused on a juvenile's reduced culpability as compared to

---

21. Jackson did not challenge his sentence on direct appeal. *Miller*, 132 S.Ct. at 2461. Following the decision in *Roper*, he filed a state petition for *habeas corpus*, arguing that *Roper's* reasoning applied equally to a 14–year–old sentenced to a mandatory term of life in prison. *Id.* The circuit court dismissed his petition and Jackson appealed. *Id.* While the appeal was pending, *Graham* was decided, and the parties filed briefs on that decision with the Arkansas Supreme Court. *Id.* The

Arkansas Supreme Court ultimately affirmed the dismissal of his petition. *Id.*

22. The Alabama Court of Criminal Appeals held that life without parole was not an overly harsh punishment for murder, and that the mandatory nature of the sentence did not offend the Eighth Amendment. *Id.* at 2462. The Alabama Supreme Court denied Miller's request for review. *Id.*

adult offenders. *Id.* at 2463. The Court related that these decisions relied not only upon "what any parent knows," but also on the social science and science behind a child's development and maturity. *Id.* at 2464. "We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his 'deficiencies will be reformed.' " *Id.*

The Court in *Miller* also emphasized that *Roper* and *Graham* found the "distinctive attributes of youth," diminished the penological justifications for sentencing a juvenile to life in prison without parole—the harshest sentence available for juveniles. *Id.*

> Because the heart of the retribution rationale relates to an offender's blameworthiness, the case for retribution is not as strong with a minor as with an adult. Nor can deterrence do the work in this context, because the same characteristics that render juveniles less culpable than adults—their immaturity, recklessness, and impetuosity—make them less likely to consider potential punishment. Similarly, incapacitation could not support the life-without-parole sentence in *Graham:* Deciding that a juvenile offender forever will be a danger to society would require making a judgment that he is incorrigible—but incorrigibility is inconsistent with youth. And for the same reason, rehabilitation could not justify that sentence. Life without parole forswears altogether the rehabilitative ideal. It reflects an irrevocable judgment about an offender's value and

place in society, at odds with a child's capacity for change.

*Id.* (internal citations and quotations omitted).

The Court in *Miller* concluded that although *Graham's* "flat ban" on a sentence of life without parole applies only to juveniles convicted of non-homicide offenses, what it said about children is not crime-specific. *Id.* "So *Graham's* reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to non[-]homicide offenses." *Id.* Specifically, the Court stressed that "youth matters" when determining whether life without parole is an appropriate sentence, and the mandatory sentencing provisions at issue before the Court prevented the sentencing authority from taking that into account. *Id.* at 2465–66. "[T]hese laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender. That contravenes *Graham's* (and also *Roper's* ) foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." *Id.*

The High Court's reliance on *Graham,* a case wherein the Court treated the sentence of life without parole for juveniles as if it were a death penalty case,[23] prompted it to consider a second line of cases—those requiring individualized sentencing for the imposition of the death penalty. *Id.* at 2467–68. The Court first considered *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion), wherein it held that a statute requiring a death sentence for first-degree murder violated the Eighth Amendment because the mandatory sen-

---

**23.** *Graham* was the first case in which the Supreme Court imposed a categorical ban on a term-of-years sentence. *Id.* at 2465.

tence "gave no significance to the character and record of the individual offender or the circumstances of the offense, and excluded from consideration the possibility of compassionate or mitigating factors." *Miller,* 132 S.Ct. at 2467 (citing *Woodson,* 428 U.S. at 304, 96 S.Ct. 2978) (quotation marks omitted).

The Court in *Miller* also found instructive the case *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), which involved a 16–year–old who shot and killed a police officer point-blank. The Court reversed Eddings' death sentence based upon the trial court's failure to "consider evidence of his neglectful and violent family background (including his mother's drug abuse and his father's physical abuse) and his emotional disturbance," all of which the Court found to be more relevant than it would have if the offender was an adult. *Miller,* 132 S.Ct. at 2467 (citing *Eddings,* 455 U.S. at 115, 102 S.Ct. 869).

After examining *Roper, Graham, Woodson,* and *Eddings,* the *Miller* Court concluded as follows:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal

with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Id.* at 2468 (internal citations to *Graham* and *J.D.B.* omitted).

The Court indicated that these factors were highly relevant in the assessment of the appropriate punishments for both Miller and Jackson. The Court questioned whether Jackson's age and maturity level affected his willingness to walk away or his calculation of the risk involved when he learned that one of the other boys had a gun, which "go to Jackson's culpability for the offense." *Id.* It further stated that Jackson's "family background and immersion in violence"—both his mother and grandmother had shot people—should have been considered by the sentencing body. *Id.*

In Miller's case, although the Court acknowledged the viciousness of the crime he committed, the Court found significant that he was high on drugs and alcohol at the time of the murder, which he had consumed with the adult victim. *Id.* at 2469. Moreover, Miller's personal history, including physical abuse by his stepfather, neglect by his drug- and alcohol-addicted mother, his various placements in foster care, and his four suicide attempts, the first of which occurred when he was only six years old, needed to be considered prior to sentencing. *Id.* The Court agreed that Miller was deserving of a severe punishment for his actions, but indicated that the sentencing body must evaluate all of the attendant circumstances before determining whether life without parole is an appropriate sentence. *Id.*

The Court in *Miller* next considered whether "objective indicia of society's stan-

dards, as expressed in legislative enactments and state practice show a national consensus against a sentence for a particular class of offenders." [24] *Id.* at 2470 (citing *Graham*, 130 S.Ct. at 2022) (quotation marks omitted). Although it observed that 29 jurisdictions make life without parole mandatory for juveniles convicted of murder in an adult court, it found this statistic to be unpersuasive. *Id.* at 2470–71. It noted that in *Graham*, 39 jurisdictions permitted juveniles to be sentenced to life in prison without parole for non-homicide offenses. *Id.* at 2471. The Court further indicated that 15 jurisdictions make life without parole discretionary for juveniles, and only 15 percent of all juveniles sentenced to life without parole arise from the discretionary jurisdictions, resulting in the conclusion that "when given the choice, sentencers impose life without parole on children relatively rarely." *Id.* at 2471 n. 10.

Moreover, many of the jurisdictions that mandate life without parole sentences for juveniles convicted of homicide do so by virtue of two distinct statutory provisions: (1) a statute requiring a sentence of life in prison without parole for certain homicide convictions, and (2) a statute mandating the transfer of juveniles accused of homicide to adult criminal court. *Id.* The Court found that this undercuts a claim of a "national consensus" in favor of the sentencing practice, as the mere availability of the sentence to juvenile offenders by virtue of the "confluence of state laws" "does not indicate that the penalty has been endorsed through deliberate, express, and full legislative consideration." *Id.* at 2473 (citation to *Graham* omitted).

Lastly, the Court addressed the ability for juveniles in some jurisdictions to request a transfer to juvenile court from adult criminal court as a remedy for the constitutional concerns of a mandatory sentence of life imprisonment without parole for those tried in adult criminal court. *Id.* at 2474. Although the Court recognized that in these jurisdictions the trial court generally has discretion to determine if a juvenile should be transferred, it found it not to be a substitute for discretion in sentencing the juvenile in adult court:

> First, the decisionmaker typically will only have partial information at this early, pretrial stage about either the child or the circumstances of the offense.
>
> \* \* \*
>
> Second and still more important, the question at transfer hearings may differ dramatically from the issue at a post-trial sentencing. Because many juvenile systems require that the offender be released at a particular age or after a certain number of years, transfer decisions often present a choice between extremes: light punishment as a child or standard sentencing as an adult (here, life without parole). [ ... ] Discretionary sentencing in adult court would provide different options: There, a judge or jury could choose, rather than a life-without-parole sentence, a lifetime prison term with the possibility of parole or a lengthy term of years.

*Id.*

The United States Supreme Court held, pursuant to *Graham, Roper,* and its individualized sentencing decisions, that a sentencing body must be able to consider mitigating circumstances before imposing the harshest penalty available for juveniles. *Id.* at 2475. It therefore found statutes requiring a mandatory sentence of life in prison without the possibility of parole to be unconstitutional in violation of

---

**24.** *See supra*, n. 17.

the Eighth Amendment as applied to juvenile offenders. *Id.* It further stated:

> [G]iven all we have said in *Roper, Graham,* and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

*Id.* at 2469 (internal citations to *Roper* and *Graham* omitted).[25]

We now turn to the case *sub judice.* Like the Arkansas and Alabama sentencing practices at issue in *Miller,* the mandatory sentence of life in prison without parole for a juvenile convicted of first- or second-degree murder in Pennsylvania is not the product of legislative deliberation resulting in a decision that the sentence is appropriate for juvenile offenders. Rather, the sentence of life in prison without parole applies to juveniles in Pennsylvania because of the mandatory transfer provi-

sion in the Juvenile Act. *See Commonwealth v. Archer,* —— Pa. ——, 722 A.2d 203, 206 (1998) (when a juvenile is charged with murder, the adult criminal division has original jurisdiction); 42 Pa.C.S.A. §§ 6302(2)(i), 6322(a), 6355(e); *see also Miller,* 132 S.Ct. at 2471–73; *Graham,* 130 S.Ct. at 2025. Pursuant to the Crimes Code, a person convicted of second-degree murder, as Knox was, is required to serve a sentence of life in prison. 18 Pa.C.S.A. § 1102(b). Finally, the "without the possibility of parole" provision is derived from the statute governing the powers and duties of the Pennsylvania Board of Probation and Parole, which prohibits the grant of parole to an inmate sentenced to serve life in prison. 61 Pa.C.S.A. § 6137(a)(1). Therefore, it is the interplay of three separate statutes in three separate chapters that results in juveniles convicted of first- or second-degree murder in Pennsylvania to be sentenced to life in prison without the possibility of parole. No personal information, factors, or mitigating circumstances are considered by the trial court when meting out this sentence. Because of the mandatory nature of this sentence, it is unconstitutional as applied to juveniles pursuant to the holding of the Supreme Court in *Miller.*

Knox was 17 years old when he committed the crimes in question. He was sentenced to the statutorily mandated term of life in prison without the possibility of

---

**25.** The Pennsylvania Supreme Court granted allowance of appeal to address the constitutionality of a mandatory sentence of life imprisonment without parole imposed on a 14–year–old convicted of first-degree murder. *See Commonwealth v. Batts,* 603 Pa. 65, 981 A.2d 1283 (2009). On July 9, 2012, the Supreme Court ordered the parties to file supplemental briefs, based upon the *Miller* decision, to address the following questions:

(1) What is, as a general matter, the appropriate remedy on direct appeal in Pennsyl-

vania for a defendant who was sentenced to a mandatory term of life imprisonment without the possibility of parole for a murder committed when the defendant was under the age of eighteen?

(2) To what relief, if any, is appellant entitled from the mandatory term of life imprisonment without parole for the murder he committed when he was fourteen years old? Order, 7/9/12. Argument is scheduled for September 2012. *Id.*

parole. Prior to sentencing Knox, the trial court did not (and indeed, could not) consider or take testimony regarding any mitigating factors that might render this sentence inappropriate for Knox. We therefore vacate Knox's judgment of sentence, and remand the case for resentencing consistent with the *Miller* decision.

The *Miller* Court did not provide a specific list of what factors the sentencer must consider when determining the appropriate sentence for a juvenile potentially facing a sentence of life in prison, only indicating that the consideration of such factors will render the punishment "uncommon" for juveniles. *Miller,* 132 S.Ct. at 2469. Our review of *Miller* indicates, at the very least, one must consider a juvenile's age at the time of the offense, his diminished culpability and heightened capacity for change, the circumstances of the crime, the extent of his participation in the crime, his family, home and neighborhood environment, his emotional maturity and development, the extent that familial and/or peer pressure may have affected him, his past exposure to violence, his drug and alcohol history, his ability to deal with the police, his capacity to assist his attorney, the presence of any drug and/or alcohol problems, his mental health history,

and his potential for rehabilitation. *See id.* at 2464, 2467–69. This is not an exhaustive list. Because the *Miller* decision was so recently decided, there has been no advocacy by the parties regarding individualized sentencing for juveniles convicted of homicide offenses. As such, on remand, we anticipate that the trial court will order briefs by the Commonwealth and Knox, and accept briefs from their respective *amici,* if any, on this issue.

As the United States Supreme Court has expressly stated that a mandatory sentence of life in prison without the possibility of parole is unconstitutional as applied to juvenile offenders, *Whitaker* is overruled. *See Whitaker,* 30 A.3d at 1197–98 (holding that a mandatory sentence of life in prison without the possibility of parole for a juvenile convicted of first-degree murder is not cruel and unusual punishment in violation of the United States and Pennsylvania Constitutions); *supra* n. 20. Likewise, to the extent that the *dicta* contained in the *Ortiz* footnote indicates that the mandatory sentence of life in prison without the possibility of parole is not unconstitutional for a juvenile convicted of second-degree murder, *Miller* overrules that premise.[26] *See Ortiz,* 17 A.3d at 422 n. 7; *supra* n. 18.[27]

---

**26.** The holding of *Ortiz*—that *Graham* did not expressly create a new constitutional right for juveniles convicted of second-degree murder and sentenced to life imprisonment without the possibility of parole for PCRA timeliness purposes—is unaffected by *Miller* and is still good law. *See Ortiz,* 17 A.3d at 421–22.

**27.** Furthermore, the jurisprudential landscape has undergone a volcanic shift since the *Williams* decision in 1987 and the *Carter* decision in 2004. The United States Supreme Court has definitively and unequivocally ruled there are vast differences between adult offenders and juvenile offenders such that youth **does** entitle a criminal defendant to differential treatment in some circumstances. *See Roper,* 543 U.S. at 578, 125

S.Ct. 1183 (death penalty unconstitutional as to juvenile defendants); *Graham,* 130 S.Ct. at 2034 (life imprisonment without parole unconstitutional as to juvenile defendants convicted of non-homicide felonies); *Miller,* 132 S.Ct. at 2460 (mandatory sentence of life imprisonment without parole unconstitutional as to juveniles convicted of homicide). Therefore, the contrary premise stated in *Carter* has been overruled. *See Carter,* 855 A.2d at 892; *Commonwealth v. Prout,* 814 A.2d 693, 695 (Pa.Super.2002) (stating that although generally bound by prior panel decisions of the Superior Court, where an intervening decision by a higher court calls that authority into question, we are bound to follow the decision of the higher court); *see also J.D.B. v. North Carolina,* —— U.S. ——, 131

Based upon the analysis previously set forth, we conclude: 1) the evidence was sufficient to support the verdict; 2) a mandatory sentence of a term of life imprisonment without the possibility of parole for a juvenile offender is cruel and unusual punishment and a violation of the Eighth Amendment of the United States Constitution and Article I, Section 13 of the Pennsylvania Constitution; and 3) prior case law holding otherwise is now overruled. As Knox was sentenced to life in prison for the commission of second-degree murder as a juvenile, we vacate the judgment of sentence and remand the case to the trial court for resentencing.

Judgment of sentence vacated. Case remanded for resentencing consistent with this Opinion. Jurisdiction relinquished.

S.Ct. 2394, 2404, 180 L.Ed.2d 310 (2011), (reaffirming the findings in *Roper* and *Graham*, acknowledging that there are significant differences between adults and juveniles which prevents juvenile offenders from being "viewed simply as miniature adults."). The Supreme Court in *J.D.B.* further noted: "Although citation to social science and cognitive science authorities is unnecessary to establish these commonsense propositions, the literature confirms what experience bears out. []Developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds[]." *Id.* at 2403 n. 5 (internal citation omitted).