J.S52002/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| VINCENT WALLACE, | : | |
| | : | |
| Appellant | : | No. 3489 EDA 2012 |

Appeal from the Judgment of Sentence December 3, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division No(s).: CP-51-CR-0015493-2010

BEFORE: GANTMAN, P.J., ALLEN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED JUNE 8, 2015**

Appellant, Vincent Wallace,[1] appeals from the judgment of sentence of life imprisonment entered in the Philadelphia County Court of Common Pleas after a jury found him guilty of murder of the second degree,[2] robbery,[3] and conspiracy.[4] Appellant claims (1) the evidence was insufficient to prove he perpetrated the crimes and (2) the trial court's separate, concurrent

---

[*] Former Justice specially assigned to the Superior Court.

[1] An appeal by Appellant's codefendant, Kyle Reed, is pending at ***Commonwealth v. Reed***, 1269 EDA 2013.

[2] 18 Pa.C.S. § 2502(b).

[3] 18 Pa.C.S. § 3701(a)(1).

[4] 18 Pa.C.S. § 903.

sentence for robbery was illegal.[5] We affirm the convictions, but vacate the sentence for robbery.

The parties are well versed in the evidence presented against Appellant and his codefendant, Kyle Reed ("Codefendant"), at their joint jury trial for the killing of Ernest Miller ("Decedent"). By way of background, Decedent was a retired police officer and maintained a photography studio on the first floor of his residence on the 2600 block of West Oakdale Avenue in the City of Philadelphia. According to the Commonwealth, Codefendant paid Decedent three or four years earlier to find modelling jobs for his then girlfriend, Raffinnee Taylor, but she received no offers. The Commonwealth alleged Codefendant, a few weeks before the killing, learned Decedent was still in business at his home on West Oakdale Avenue. Codefendant, along with Appellant and Michael Grant, planned to go to Decedent's residence to recover his money from Decedent.

On the afternoon of December 28, 2008, Appellant, Codefendant, and Grant allegedly went to Decedent's residence Although there was no evidence of forced entry, a gunfight occurred on the first floor of the home that involved at least two firearms. Decedent and Grant suffered fatal gunshot wounds. Appellant suffered a gunshot wound to his pelvis.

---

[5] The Commonwealth agrees the separate sentence for robbery should have merged with the sentence for second-degree murder and should be vacated. Commonwealth's Brief at 1 n.1.

Codefendant allegedly dragged Grant from the residence, but left him outside by the front door, and drove Appellant to Einstein Hospital.

Duane Tate was driving near the scene of the shooting, and saw Appellant limp to the passenger side of a dark sedan with front-end damage near the 2500 block of West Oakdale Avenue.[6] Video surveillance at Einstein Hospital showed an individual exit from the passenger side of a similar vehicle in a parking lot near the emergency room at 4:13 p.m., and limp toward the emergency room.

None of the firearms involved in the shooting were found, and no physical evidence linked Appellant or Codefendant to the shooting. However, investigators obtained statements from Grant's wife, Michelle Hinds, and Codefendant's former girlfriend, Taylor, implicating Codefendant and placing Appellant at the scene of the shooting. Appellant was charged on January 6, 2009, with homicide, robbery, criminal conspiracy, and related offenses.

Appellant proceeded with Codefendant to a joint jury trial beginning November 26, 2012. The Commonwealth, *inter alia*, called Grant's wife, who testified that on the afternoon of December 28, 2008, Grant told her he was "making a run with [Codefendant.]" N.T., 11/26/12, at 131. Later that

---

[6] Tate subsequently identified Appellant at a preliminary hearing on February 3, 2010. N.T., 11/28/12, at 179. At the time of trial, Tate was declared unavailable and his preliminary hearing testimony was read into the record. **Id.** at 173.

evening, she met Codefendant in the Germantown section of Philadelphia, and he stated there was a shootout and Grant "didn't make it back from this one." *Id.* at 116, 120-21. He told her Grant and another friend were shot, Grant was dead, and the person who shot Grant was dead. *Id.* at 122-23. He described how he attempted to drag Grant to the car, but decided to leave him to take the other friend to a hospital. *Id.* at 121-22.

The Commonwealth also called Taylor, Codefendant's former girlfriend, and introduced three prior statements she gave to police, two on December 30, 2008, and one on January 2, 2009.[7] *Id.* at 169-70, 188-89, 207-08; N.T., 11/28/12, at 99-122. In her first statement on December 30th, Taylor identified pictures of Appellant, Codefendant, and Grant and told detectives they were friends. N.T., 11/28/12, at 105. In her second statement on December 30th, she further described the past friendship between Appellant and Codefendant. *Id.* at 113-14. In her third statement on January 2nd, Taylor indicated "a few weeks" before the shooting, she told Codefendant she saw Decedent at his residence during an audition. *Id.* at 120-21. Codefendant "got mad," told her Decedent owed him money, and stated he would "go down there to see" Decedent. *Id.* at 120. When

_____

[7] Taylor's first statement was taken at 11:55 a.m., on December 30, 2008, the second at 4:30 p.m., that same day, and the third at 8:45 p.m., on January 2, 2009. Taylor adopted her first statement at trial, but recanted her second and third statements. She asserted detectives used coercive interrogation tactics, including detaining her incommunicado from December 29, 2008, to January 2, 2009, and keeping her shackled in an interview room at the Homicide Unit without food and water.

detectives asked whether Decedent owed Codefendant money, Taylor responded Codefendant paid Decedent several hundred dollars four years earlier for a modelling program, but she did not get a job. *Id.* at 119, 121. She further stated that on the evening of December 28, 2008, Codefendant told her "Vince, Mike and the boy Emir got shot."[8] *Id.* at 121.

On December 3, 2012, the jury found Appellant and Codefendant guilty of second-degree murder, robbery, and conspiracy to commit robbery, and not guilty of possessing an instrument of crime. That same day, the trial court imposed a sentence of life imprisonment for second-degree murder and concurrent sentences of five to ten years' imprisonment each for conspiracy and robbery.

Appellant did not file post-sentence motions, but filed a timely notice of appeal on December 18, 2012, and later complied with the trial court's order to submit a Pa.R.A.P. 1925(b) statement. The presiding judge retired, and a Rule 1925(a) opinion was not authored.

Appellant presents the following questions on appeal:

> Is [A]ppellant entitled to an arrest of judgment with respect to his convictions for second degree murder, robbery, and criminal conspiracy since the evidence is insufficient to sustain the verdicts of guilt . . . ?

> Is [A]ppellant entitled to have his separate sentence for robbery vacated since the imposition of a separate

---

[8] Taylor previously identified "Vince" as Appellant, "Mike" as Grant, and referred to Decedent as "Emir". N.T., 11/28/12, at 105, 119.

sentence for robbery following conviction for second degree murder violates double jeopardy?

Appellant's Brief at 4.

Appellant first claims the evidence was insufficient to sustain the verdicts. He asserts "[t]he Commonwealth's evidence failed to establish [his] identity as a shooter or as a participant in the incident resulting in [Decedent's] death." *Id.* at 17. According to Appellant, there was no evidence "that he removed any property or attempted to remove any property from [Decedent], that he fired a weapon or that he was responsible for the victim's death." *Id.* at 18. He claims he "was merely present during the incident and, therefore, not criminally culpable" as an accomplice or a coconspirator. *Id.* We disagree.

The principles governing our review of the sufficiency of the evidence are as follows:

> The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire

> record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Lambert*, 795 A.2d 1010, 1014 (Pa. Super. 2002) (citations and some punctuation omitted).

However,

> [w]hile reasonable inferences must be drawn in the Commonwealth's favor, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fall even under the limited scrutiny of appellate review.

*Commonwealth v. Robinson*, 817 A.2d 1153, 1158 (Pa. Super. 2003) (citations, emphasis, and some punctuation omitted).

The elements of the relevant crimes are as follows. "Murder of the second degree is a criminal homicide committed while a defendant was engaged as a principal or an accomplice in the perpetration of a felony." *Lambert*, 795 A.2d at 1015 (citing 18 Pa.C.S. § 2502(b)). The phrase "perpetration of a felony," in relevant part, means the act of "being an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery[.]" *Id.* (citing 18 Pa.C.S. § 2502(d)). "[A]n accomplice is someone who, 'with the intent of promoting or facilitating the commission of the offense aids or agrees or attempts to

aid [another person] in planning or committing' the crime." *Id.* at 1024 (citing 18 Pa.C.S. § 306(c)(1)(ii)).

Conspiracy requires the Commonwealth to establish "that the defendant entered an agreement to commit or aid in an unlawful act with another person or persons with a shared criminal intent and an overt act was done in furtherance of the conspiracy." *Id.* at 1016 (discussing 18 Pa.C.S. § 903).

> A conspiracy is almost always proved through circumstantial evidence. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. . . .
>
>         \*     \*     \*
>
> Among the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred.

*Id.* (citations and some punctuation omitted).

Under 18 Pa.C.S. § 3701, "[a] person is guilty of robbery if, in the course of committing a theft, he . . . inflicts serious bodily injury." 18 Pa.C.S. § 3701(a)(1)(i). "An act shall be deemed 'in the course of

committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission." 18 Pa.C.S. § 3701(a)(2).

It is well settled that a defendant may be held criminally liable for the conduct of others. "An accomplice is also legally accountable for the conduct of the other person involved in committing the crimes." *Commonwealth v. Knox*, 50 A.3d 749, 755 (Pa. Super. 2012) (citing 18 Pa.C.S. § 306(b)(3)). Furthermore, the overt act in a conspiracy need not be committed by the defendant. *Id.* Rather, liability extends to all actions of a coconspirator in furtherance of the conspiracy. *Id.*

Instantly, there was no physical or direct evidence linking Appellant to either the shooting inside Decedent's home, or a theft from Decedent, and guilty verdicts based on a theory that Appellant was a principal in the killing or a competed theft would be speculative. *See Robinson*, 817 A.2d at 1158. Thus, the Commonwealth's burden was to prove Appellant came to a criminal agreement with Codefendant or Grant to use or threaten force to deprive Decedent of property, and at least one conspirator took an overt act in furtherance of that conspiracy to commit robbery. *See* 18 Pa.C.S. §§ 903, 3701(a)(1); *Knox*, 50 A.3d at 755. Critically, the Commonwealth was also required to prove that Appellant intended to promote or facilitate the commission of the attempted robbery during which Decedent was killed. *See* 18 Pa.C.S. §§ 306(c)(1)(ii), 2502(b), (d); *Lambert*, 795 A.2d at 1015, 1024.

As to Appellant's presence at the scene, we note Appellant, in two interviews with detectives at Einstein Hospital,[9] stated he was wounded during a robbery near Broad Street and Olney Avenue, several miles from Decedent's residence. *See* N.T., 11/27/12, at 79, 146. However, Decedent's neighbor, Tate, identified Appellant and testified he was limping from the direction of the 2600 block of West Oakdale Avenue, to a car on the 2500 block. N.T., 11/28/12, at 178-79. The jury also heard evidence that Codefendant told Grant's wife that Grant and another friend were shot, but the person who shot Grant was dead. N.T., 11/26/12, at 122-23. Codefendant also told Taylor that Grant and Appellant were shot. N.T., 11/28/12, at 121. Thus, there was sufficient circumstantial evidence to conclude Appellant was present at the scene and wounded during the shootout at Decedent's residence.

As to Appellant's contention he was merely present at the time of the shooting, the Commonwealth, through Taylor's trial testimony and her prior statements, presented evidence of an existing association between Appellant

---

[9] Detective Matthew Gillespie from Northwest Detectives and Detective Schell, whose first name and assignment was not revealed at trial, interviewed Appellant at Einstein Hospital in the morning of December 29, 2008. N.T., 11/27/12, at 70-72. Detective James Poulous from Northwest Detectives interviewed Appellant later that same afternoon. *Id.* at 143. Detective Poulous testified, without objection from the defense, that Appellant gave inconsistent explanations and did not "give additional information" after the detective confronted him. *Id.* at 146-48. The parties stipulated that Appellant was receiving several pain medications following surgery. N.T., 11/29/12, at 19.

and Codefendant.[10]  At trial, Taylor acknowledged Appellant and Codefendant were friends.  N.T., 11/26/12, at 154.  Taylor further told detectives Appellant and Codefendant were friends for as long as she knew Codefendant, and she used to see Appellant at Codefendant's house "doing a lot of cleaning or just hanging around if [Codefendant] needed him to do something."  N.T., 11/28/12, at 113.

Several weeks before the shooting, Codefendant told Taylor he intended to "see" Decedent regarding the alleged debt.  *Id.* at 120.  On the afternoon of the shooting, Grant told his wife he was "making a run" with Codefendant.  N.T., 11/26/12, at 131.  Appellant, Codefendant, and Grant approached Decedent's residence dressed in dark clothes.[11]  Police also found a pair of handcuffs, a set of keys, and a walkie-talkie outside Decedent's home.  N.T., 11/27/12, at 9, 33.  Although no firearms involved in the shooting were found, expert testimony established at least one firearm, likely a revolver, was used to shoot at Decedent, while Decedent

---

[10] To the extent Appellant asserts Taylor's prior statements were unworthy of belief, such assertions go to the weight, not the sufficiency of the evidence.  *See Lambert*, 795 A.2d at 104.

[11] The jury was able to view Grant's and Appellant's clothing from the shooting.  N.T., 11/27/12, at 36 (discussing hoody sweatshirt at scene with bullet hole and blood matched by DNA to Grant), 152 (describing Appellant's clothes as "black track suit, jacket, . . . matching pants, black boot, [and] black hat with a 'G' on it").  Moreover, Taylor's first statement to police indicated Appellant was wearing dark jeans and a dark shirt.  N.T., 11/28/12 at 104. The Commonwealth, in closing argument, argued the dark clothes supported its theory that Codefendant "went down there on a mission to take care of business."  N.T., 11/29/12, at 78.

fired toward the front doorway of his home with a Glock-type semi-automatic. *Id.* at 47, N.T., 11/28/12, at 56-58. Moreover, despite the evidence establishing Appellant had been shot at the 2600 block of West Oakdale Avenue, he told detectives he was shot near Broad Street and Olney Avenue.

This circumstantial evidence, when read in a light most favorable to the Commonwealth, sustained the following inferences. Codefendant went to Decedent's residence to resolve a perceived debt, and arranged for Appellant and Grant to accompany him. Appellant, Codefendant and Grant approached Decedent's residence dressed in dark clothing and with at least one firearm, a pair of handcuffs, and at least one walkie-talkie among them. Grant entered Decedent's residence and was mortally wounded inside the home. Appellant was within sufficient distance to be shot. Codefendant dragged Grant from the home, but left him outside the residence to assist Appellant. Significantly, the only connection between Appellant and Decedent was Codefendant's statement to Taylor that he intended to meet Decedent about the debt.

Given these inferences, we conclude that the jury was entitled to find (1) Appellant entered into a criminal agreement to deprive Decedent of money, (2) the use of force was within the scope of the conspiracy, (3) Appellant intended to assist Codefendant to take Decedent's money when approaching Decedent's home, and (4) Decedent was killed during the

perpetration of an attempted robbery. **See Knox**, 50 A.3d at 757; **Lambert**, 795 A.2d at 1016. Thus, we discern no merit to Appellant's contention that the evidence only established his "mere presence" at the scene and conclude no relief is due on the convictions for conspiracy, robbery, and second-degree murder.

Appellant next contends the trial court illegally sentenced him on both second-degree murder and robbery. Appellant asserts the court's sentences for second-degree murder and the predicate felony offense of robbery violated double jeopardy principles.[12] Appellant's Brief at 32 (citing **Commonwealth v. Tarver**, 426 A.2d 569, 573 (Pa. 1981)). As noted above, the Commonwealth agrees limited relief is due on this claim.

There is a common law history requiring robbery be merged with second-degree murder at sentencing. **See id.** (overruling **Commonwealth v. Sparrow**, 370 A.2d 712 (Pa. 1977), and holding robbery is "constituent offense" of second-degree murder and thus "same offense" under double jeopardy test in **Blockburger v. United States**, 284 U.S. 299 (U.S. 1932)). However, the General Assembly, effective February 2003, created a statutory merger provision, which states, "No crimes shall merge for

---

[12] Although raised for the first time on appeal, this issue challenges the legality of the sentence on robbery and cannot be waived. **See Commonwealth v. Tanner**, 61 A.3d 1043, 1046 (Pa. Super. 2013) ("challenges to an illegal sentence can never be waived and may be reviewed *sua sponte* by this Court. An illegal sentence must be vacated." (citations and some punctuation omitted)).

sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense." 42 Pa.C.S. § 9765. Section 9765 reflects a "strict elements approach," which "preclude[s] the courts of this Commonwealth from merging sentences for two offenses that are based on a single criminal act unless all of the statutory elements of one of the offenses are included in the statutory elements of the other." *Commonwealth v. Baldwin*, 985 A.2d 830, 837 (Pa. 2009); *Commonwealth v. Quintua*, 56 A.3d 399, 402 (Pa. Super. 2012).

In *Baldwin*, the Pennsylvania Supreme Court observed:

> Labels, such as "pure elements test" and "strict elements approach," have often led to greater mischief. For example, in *Whalen* [*v. United States*, 445 U.S. 684, (1980)], the United States Supreme Court struggled to determine whether a felony murder conviction merged with a conviction for the underlying felony where a felony murder conviction could hinge on any one of six enumerated offenses. **A "strict elements approach," which does not consider the offenses as charged and proven in each particular case, invariably leads to the conclusion that the crimes do not merge.** Nevertheless, a majority of the Court, relying on *Blockburger* (often used synonymously with "strict elements approach") held that the two convictions merged for sentencing. In this regard, the Court demonstrated a recognition that examination of the elements of the crimes as charged is sometimes necessary, especially when dealing with an offense that can be proven in alternate ways.

*Baldwin*, 985 A.2d at 837 n.6 (emphasis added).

It is clear Section 9765 has disrupted at least some of the prior decisional law regarding merger. ***See Commonwealth v. Quintua***, 56 A.3d at 402 (holding burglary and criminal trespass do not merge). However, ***Tarver***'s analysis was based on a strict elements approach rooted in ***Blockburger***, which, in turn, reflects principles similar to those adopted by the General Assembly when enacting Section 9765. ***See Baldwin***, 985 A.2d at 837 n.6. Thus, ***Tarver*** remains binding authority on this Court. Accordingly, we agree with the parties that Appellant's conviction for murder of the second degree and robbery merge, and vacate the sentence for robbery. Because our decision does not affect the aggregate sentence, a remand for resentencing is unnecessary. ***See Commonwealth v. Henderson***, 938 A.2d 1063, 1067-68 (Pa. Super. 2007).

Judgment of sentence affirmed in part. Sentence for robbery vacated.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/8/2015