J.S52003/14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| KYLE REED, | : | |
| | : | |
| Appellant | : | No. 1269 EDA 2013 |

Appeal from the Judgment of Sentence December 3, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division No(s).: CP-51-CR-0015615-2010

BEFORE: GANTMAN, P.J., ALLEN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:          **FILED JUNE 8, 2015**

Appellant, Kyle Reed,[1] appeals from the judgment of sentence of life imprisonment entered in the Philadelphia County Court of Common Pleas after a jury found him guilty of murder of the second degree,[2] robbery,[3] and conspiracy.[4] He challenges the sufficiency and weight of the evidence.[5] He

---

[*] Former Justice specially assigned to the Superior Court.

[1] An appeal by Appellant's codefendant, Vincent Wallace, is pending at **Commonwealth v. Wallace**, 3489 EDA 2012.

[2] 18 Pa.C.S. § 2502(b).

[3] 18 Pa.C.S. § 3701(a)(1).

[4] 18 Pa.C.S. § 903.

also filed a petition for post-submission communication[6] in this Court requesting a remand to consider his claims of newly discovered evidence. We affirm the convictions, grant the petition for post-submission communication, deny the petition for remand, but vacate an illegal sentence imposed for robbery in light of the sentence for second-degree murder.

The parties are well versed in the evidence presented against Appellant and his codefendant, Vincent Wallace ("Codefendant"), at their joint jury trial for the killing of Ernest Miller ("Decedent"). By way of background, Decedent was a retired police officer and maintained a photography studio on the first floor of his residence on the 2600 block of West Oakdale Avenue in the City of Philadelphia. According to the Commonwealth, Appellant paid Decedent three or four years earlier to find modelling jobs for his then girlfriend, Raffinnee Taylor, but she received no offers. The Commonwealth alleged Appellant, a few weeks before the killing, learned Decedent was still in business at his home on West Oakdale Avenue. Appellant, along with Codefendant and Michael Grant, planned to go to Decedent's residence recover his money from Decedent.

On the afternoon of December 28, 2008, Appellant, Codefendant, and Grant allegedly went to Decedent's residence. Although there was no

---

[5] We have reordered Appellant's arguments.

[6] **_See_** Pa.R.A.P. 2501.

- 2 -

indication of forced entry, a gunfight occurred on the first floor inside the home that involved at least two firearms. Decedent and Grant suffered fatal gunshot wounds. Codefendant suffered a gunshot wound to his pelvis. Appellant allegedly dragged Grant from the residence, but left him outside by the front door, and drove Codefendant to Einstein Hospital.

Duane Tate was driving near the scene of the shooting, saw Codefendant limping to the passenger side of a dark sedan with front-end damage near the 2500 block of West Oakdale Avenue. N.T., 11/28/12, 178-79. Three days after the shooting, on December 31, 2008, detectives asked Tate to identify the driver of that vehicle from a photographic array. *Id.* at 187. Tate selected two pictures, one of which was Appellant.[7] *Id.*

None of the firearms involved in the shooting were found. No physical evidence linked Appellant or Codefendant to the shooting. However, investigators obtained statements from Grant's wife and Taylor implicating Appellant and Codefendant.

Appellant was charged on January 6, 2009, with homicide, robbery, criminal conspiracy, and related offenses. He was not located at his residence, and the matter was referred to the fugitive squad. Appellant was

---

[7] Tate subsequently identified Appellant at a preliminary hearing on February 3, 2010. N.T., 11/28/12, at 182. At the time of trial, Tate was declared unavailable and his preliminary hearing testimony was read into the record. *Id.* at 173. The trial court instructed the jury to consider Tate's identifications of Appellant with caution. *See Commonwealth v. Kloiber*, 106 A.2d 820 (Pa. 1954).

taken into custody at a residence on the 8100 block of Algon Avenue on April 20, 2009. At the time of his arrest, police searched a bedroom of the residence and found his identification, a "master" key for handcuffs, and a ballistics vest.

Appellant proceeded with Codefendant to a joint jury trial beginning November 26, 2012. Of relevance to this appeal, the Commonwealth called Grant's wife, who testified that on the afternoon of December 28, 2008, Grant told her he was "making a run with [Appellant.]" N.T., 11/26/12, at 131. Later that evening, she met Appellant in the Germantown section of Philadelphia, and he told her there was a shootout and Grant "didn't make it back from this one." *Id.* at 116, 120-21. He told her Grant and another friend were shot, Grant was dead, and the person who shot Grant was dead. *Id.* at 122-23. He described dragging Grant down a set of stairs, but leaving him to take the other friend to a hospital. *Id.* at 121-22.

The Commonwealth also called Taylor, Appellant's former girlfriend, and introduced three prior statements she gave to police, two on December 30, 2008, and one on January 2, 2009. *Id.* at 169-70, 188-89, 207-08; N.T., 11/28/12, at 99-122. As discussed in further detail below, the Commonwealth presented Taylor's third statement as substantive evidence of motive—*i.e.*, her enrollment in a modelling program run by Decedent, her failure to obtain a modelling job, and Appellant's statement that he intend to

see Decedent about the money he previously paid to Decedent. *See* N.T., 11/28/12, at 120-21.

On December 3, 2012, the jury found Appellant and Codefendant guilty of second-degree murder, robbery, and conspiracy to commit robbery, and not guilty of possessing an instrument of crime. That same day, the trial court imposed a sentence of life imprisonment for second-degree murder and concurrent sentences of five to ten years' imprisonment each for conspiracy and robbery.

Appellant timely filed post-sentence motions, which were denied by operation of law on April 12, 2013, after the presiding judge retired. Appellant filed a timely notice of appeal. An order requiring the filing of a Pa.R.A.P. 1925(b) statement was not entered, nor was a Pa.R.A.P. 1925(a) opinion authored. This appeal followed.

Appellant presents two questions, which we have reordered as follows:

> Whether there was insufficient evidence to convict . . . Appellant of Murder in the Second Degree, Robbery and Conspiracy where there was an absence of evidence that . . . Appellant conspired, aided or encouraged the commission of a robbery or that a robbery was even taking place[?]
>
> Whether the adjudication of guilt is against the weight of the evidence and shocking to one's sense of justice . . . ?

Appellant's Brief at 6. As noted above, Appellant also raises in this Court a claim of newly discovered evidence in a petition for remand for an evidentiary hearing.

Appellant first challenges the sufficiency of the evidence. He asserts the Commonwealth's evidence failed to establish reasonable inferences he drove Codefendant and Grant to Decedent's residence, was armed, or was aware Codefendant or Grant was armed. *Id.* at 18. He continues, "There [was] no evidence [he] was ever inside [Decedent's] home," and "the whole theory of a robbery for $400 motive which comes from Raffinnee Taylor is incredible." *Id.* at 18-19. He concludes, "[T]he inferences drawn by this jury that [he] conspired with Grant and [Codefendant] to rob [Decedent were] unreasonable[.]" *Id.* at 19. We disagree.

Our standards of review are well settled.

> The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Lambert***, 795 A.2d 1010, 1014 (Pa. Super. 2002)

(citations and some punctuation omitted).

However,

> [w]hile reasonable inferences must be drawn in the Commonwealth's favor, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of the accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fall even under the limited scrutiny of appellate review.

***Commonwealth v. Robinson***, 817 A.2d 1153, 1158 (Pa. Super. 2003)

(citation and some punctuation omitted).

The elements of the relevant crimes are as follows. "Murder of the second degree is a criminal homicide committed while a defendant was engaged as a principal or an accomplice in the perpetration of a felony." ***Lambert***, 795 A.2d at 1015 (citing 18 Pa.C.S. § 2502(b)). The phrase "perpetration of a felony," in relevant part, means the act of "being an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery[.]" ***Id.*** (citing 18 Pa.C.S. § 2502(d)). "[A]n accomplice is someone who, 'with the intent of promoting or facilitating the commission of the offense aids or agrees or attempts to aid [another person] in planning or committing' the crime." ***Id.*** at 1024 (citing 18 Pa.C.S. § 306(c)(1)(ii)).

Conspiracy requires the Commonwealth to establish "that the defendant entered an agreement to commit or aid in an unlawful act with another person or persons with a shared criminal intent and an overt act was done in furtherance of the conspiracy." *Id.* at 1016 (discussing 18 Pa.C.S. § 903).

> A conspiracy is almost always proved through circumstantial evidence. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. . . .
>
> \* \* \*
>
> Among the circumstances which are relevant, but not sufficient by themselves, to prove a corrupt confederation are: (1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy. The presence of such circumstances may furnish a web of evidence linking an accused to an alleged conspiracy beyond a reasonable doubt when viewed in conjunction with each other and in the context in which they occurred.

*Id.* (citations and some punctuation omitted).

Under 18 Pa.C.S. § 3701, "[a] person is guilty of robbery if, in the course of committing a theft, he . . . inflicts serious bodily injury." 18 Pa.C.S. § 3701(a)(1)(i). "An act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission." 18 Pa.C.S. § 3701(a)(2).

It is well settled that a defendant may be held criminally liable for the conduct of others. "An accomplice is also legally accountable for the conduct of the other person involved in committing the crimes." *Commonwealth v. Knox*, 50 A.3d 749, 755 (Pa. Super. 2012) (citing 18 Pa.C.S. § 306(b)(3)). Furthermore, the overt act in a conspiracy need not be committed by the defendant. *Id.* Rather, liability for the conspiracy extends to all actions of a coconspirator in furtherance of the conspiracy. *Id.*

As to Appellant's claim that the jury was not entitled to credit Taylor's prior statements, it was within the province of the jury to believe all, part, or none of the evidence presented, and we must draw all reasonable inferences in favor of the Commonwealth. *See Lambert*, 795 A.2d at 1014. Given our standards of review, Appellant's arguments regarding Taylor's prior statements go to the weight of the evidence, which we discuss below, and do not warrant relief in the form of discharge. *See id.*

As to Appellant's contentions that the jury lacked a reasoned basis to find he intended to rob Decedent and was merely present outside Decedent's residence, our review reveals the following. Taylor testified at trial that Appellant, Codefendant, and Grant were friends. N.T., 11/26/12, at 154, 163-64. The Commonwealth subsequently impeached, for substantive purposes, Taylor's testimony with her prior statements to police. Specifically, in her third statement to police, she indicated that several weeks before the shooting, Appellant learned Decedent was still in the

photography business, became angry, and stated Decedent owed him money. N.T., 11/28/12, at 120. He told Taylor he intended to "see" Decedent. *Id.* After the shooting, Appellant told her Grant, Codefendant, and Decedent were shot. *Id.* at 121.

On the afternoon before the shooting, Grant told his wife he was "making a run" with Appellant. N.T., 11/26/12, at 131. The evidence indicated that Appellant, Codefendant, and Grant thereafter approached Decedent's residence dressed in dark clothes.[8] Moreover, the Commonwealth introduced evidence suggesting that after the shooting, Appellant drove Codefendant to a hospital parking lot, but did not accompany him to the emergency room. Although Appellant was charged on January 6, 2009, he was not located and arrested until April 20, 2009.

Additionally, police also found a pair of handcuffs and a walkie-talkie at the scene of the shooting, near where Grant was discovered. N.T., 11/27/12, at 9, 33. Expert testimony established at least one firearm, likely a revolver, was used to shoot at Decedent, while Decedent fired toward the

---

[8] The jury was able to view Grant's and Codefendant's clothing from the shooting. N.T., 11/27/12, at 36 (discussing hoody sweatshirt at scene with bullet hole and blood matched by DNA to Grant), 152 (describing Codefendant's clothes as "black track suit, jacket, . . . matching pants, black boot, [and] black hat with a 'G' on it"). Moreover, Taylor's first statement to police indicated Appellant was wearing dark jeans and a dark shirt. N.T., 11/28/12 at 104. The Commonwealth, in closing argument, argued the dark clothes supported its theory that Appellant "went down there on a mission to take care of business." N.T., 11/29/12, at 78.

front doorway of his home with a Glock-type semiautomatic pistol. *Id.* at 47, N.T., 11/28/12, at 56-58.

This circumstantial evidence, when read in a light most favorable to the Commonwealth, sustained the following inferences. Appellant went to Decedent's resident to resolve a perceived debt, and arranged for Codefendant and Grant to accompany him. Appellant, Codefendant and Grant went to Decedent's residence dressed in dark clothing and with at least one firearm, a pair of handcuffs, and at least one walkie-talkie among them. Grant entered Decedent's residence and was mortally wounded inside the home. Codefendant was within sufficient distance to be shot. Appellant was aware both Grant and Codefendant were shot, dragged Grant from the home, but left him outside the residence to assist Codefendant and flee the scene. Significantly, the only connection among Appellant, Codefendant, Grant, and Decedent was Appellant's statement to Taylor that he intended to meet Decedent about the debt.

Given these inferences, which were reasonable based on the totality of the circumstances, we conclude that the jury was entitled to find (1) Appellant promoted an attempted robbery and used Codefendant and Grant to assist the satisfaction of the perceived debt by a show or use of force and (2) Decedent was killed during the perpetration of the attempted robbery Appellant promoted. *See Knox*, 50 A.3d at 757; *Lambert*, 795 A.2d at 1016. Thus, Appellant's contention that the evidence only established his

"mere presence" at the scene warrants no relief from his convictions for conspiracy, robbery, and second-degree murder.

Second, Appellant challenges the weight of the evidence. He again argues the evidence did not provide a proper basis for the jury's findings and suggests the evidence established only his "mere presence" near Decedent's home. Appellant's Brief at 16. He further asserts the credibility of Taylor's prior statements were "tarnished by manipulation and treatment she received from" her interrogators. *Id.* at 16-17. In sum, Appellant asserts if the jury properly weighed evidence that the detectives coerced Taylor, the Commonwealth's theory of a conspiracy would fail, "tipp[ing] the balance" toward a defense verdict. *Id.* at 17. We disagree.

It is well settled that a defendant must present his challenge to the weight of the evidence to the trial court for a review in the first instance. *See* Pa.R.Crim.P. 607(A); *Commonwealth v. Griffin*, 65 A.3d 932, 939 (Pa. Super. 2013). Thereafter,

> appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000) (citations omitted).

Instantly, Appellant preserved his weight of the evidence challenge in a timely post sentence motion. However, the trial court did not rule on the motion before retiring. The post-sentence motion was then denied by operation of law, and no order for a Pa.R.A.P. 1925(b) statement was issued. Under these exceptional circumstances, we are constrained to review this claim in the first instance. *See Armbruster v. Horowitz*, 813 A.2d 698, 705 (Pa. 2002) (holding "where a properly preserved weight of the evidence claim is raised on appeal and the judge who presided at trial failed to rule on the claim and is now permanently unavailable to do so, the claim must be reviewed by the appellate tribunal in the first instance").

The following principles govern our review under these peculiar circumstances.

> A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict. Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain

> facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

***Widmer***, 744 A.2d at 751-52 (citations, some punctuation, and footnote omitted).

As to Appellant's contention the jury should have disregarded Taylor's statements to police due to undue coercion, our review reveals the following. One day after the shooting, on December 29, 2008, detectives obtained a warrant to search for Decedent's firearm at Taylor's home. Detective Ohmarr Jenkins testified he served the warrant in the early morning hours of December 30th, but did not find the firearm. He brought Taylor to police headquarters at approximately 7:00 or 8:00 a.m. that morning. Although different pairs of detectives formally interviewed Taylor on different occasions, Detective Jenkins testified he observed or participated in all of the interviews.

In Taylor's first formal statement, which was taken by Detectives Gaines and Glenn[9] at 11:55 a.m., she identified photographs of Appellant, Codefendant and Michael Grant and noted they were all friends. N.T., 11/28/12, at 101, 104-05. She indicated Appellant stopped at her home in the afternoon of December 28th and left. ***Id.*** at 103-04. He was wearing dark jeans and a dark shirt. ***Id.*** at 104. Later that day, at 9:00 p.m., she

_____

[9] The first names of Detectives Gaines and Glenn were not contained in the record.

saw Appellant in the Germantown section of Philadelphia. *Id.* at 103. Taylor adopted this first statement at trial. N.T., 11/26/12, at 167.

At 4:30 p.m. that same day, Taylor gave a second statement to Detectives Pitts[10] and Jenkins. Detective Jenkins stated she was in the lobby area on a bench and he took her to a cubicle at the "outer-part of our office." N.T., 11/28/12, at 109, 139-40. Taylor stated she met Appellant in the Germantown section of Philadelphia on the evening of December 28, 2008, and drove him "around the corner." *Id.* at 111. He exited her car and went to another car. *Id.* She then drove around the block and later met Appellant where he exited her car. *Id.* He got back in her car and told her Grant "got shot." *Id.* She then drove him to another neighborhood. *Id.* Taylor signed her second statement.

On January 2, 2009, Taylor gave a third statement to Detectives Pitts and Glenn at 8:45 p.m. N.T., 11/26/12, at 188-89, 11/28/12, at 118-19. She indicated Decedent took pictures of her four years earlier, when she was eighteen. *Id.* at 119. According to this statement, a "few weeks" before Decedent's death, she went to an audition at Decedent's residence. *Id.* at 119-20. *Id.* at 119-20. She recognized him and gave him a hug. *Id.* at 120. However, she left the audition due to the crowd and returned to her home. *Id.* Later that day, she told Appellant she met Decedent. *Id.*

---

[10] Detective Pitts' first name was not contained in the record. However, Appellant alleges Detective James Pitts interrogated Taylor.

Although Taylor initially denied giving these statements, she conceded their veracity upon further confrontation by the Commonwealth.

Furthermore, Taylor's third statement indicated that after she told Appellant she met Decedent, Appellant became angry, stated Decedent owed him money, and told her he was "going to go down there to see him." *Id.* When the detectives asked her about the meaning of Appellant's statements, she stated, "I think he was going to ask him for the money. And if [Decedent] said no, [Decedent] was going to have a problem.  . . . That [Appellant] would just rob him." *Id.* at 121.  She stated she believed Appellant paid Decedent $400 or $500 to find her modeling jobs several years earlier.  *Id.*  She stated that after the shooting, Appellant told her Codefendant, Grant, and Decedent were shot.  *Id.*  Taylor signed her third statement.

At trial, Taylor recanted portions of her second and third statements and stated the detectives told her what to say or typed their own words into the statements.  N.T., 11/26/12, at 168, 187, 197.  On cross-examination, she testified she was taken to the Homicide Unit on December 29, 2008, and placed in an interview room in handcuffs.  *Id.* at 248-49.  She gave her first statement, but was left in the room.  *Id.* at 252-253.  Detectives Jenkins and Pitts, who conducted the second interview, threatened to charge her with crimes and told her she would never see her children again.  *Id.* at 188, 253-56.  They did not offer her food, drink, water, or bathroom breaks.  *Id.*

at 255. Detectives took her phone and did not let her make phone calls. *Id.* at 257. She was then detained incommunicado in the interview room from December 29th to January 2nd. *Id.* at 256-57. She was only released when her family obtained a lawyer and the lawyer arrived at the Homicide Unit. *Id.* at 257. She was forced to sign her statements. *Id.* at 178, 257.

Detective Jenkins testified at trial and denied Taylor was detained from December 29th to January 2nd. N.T., 11/28/12, at 118. He explained that although Taylor's first written statement was dated December 29th, he brought Taylor to the Homicide Unit at 7:00 or 8:00 a.m. on December 30th. *Id.* at 100, 118. As noted above, he testified Taylor was formally interviewed that day at 11:55 a.m. and 4:30 p.m., and those interviews occurred at a cubicle in the office. Detective Jenkins maintained no threats, force, or coercion were used during any of the interviews. *Id.* at 114, 123. He testified Taylor "was never handcuffed while inside the Homicide Unit at all or being transported to Homicide." *Id.* at 109.

However, the detective conceded before the second interview, he conducted informal verbal interactions that "went on for a couple of hours," but did not take written notes. *Id.* at 140. Additionally, he did not recall whether Taylor asked for food, water, or a bathroom break. *Id.* at 110. He did not testify he offered such comforts, but rather stated, "They just have to ask." *Id.* The detective testified that after taking Taylor's second statement on December 30th, he took her home "later that evening." *Id.* at

115. Although Taylor's third statement on January 2nd was transcribed at 8:45 p.m., and indicated detectives spoke to her at her home that day, the Commonwealth adduced no evidence establishing when the detectives arrived at her home or when she arrived at the Homicide Unit.[11] *Id.* at 119.

Our review reveals some incongruities and gaps in Detective Jenkins' testimony that could raise an inference of undue coercion during the interviews of Taylor. Nevertheless, our responsibility is not to sit as a thirteenth juror, but to determine whether certain facts are so clearly of greater weight that to ignore them is to deny justice. *See Widmer*, 744 A.2d at 752. In so doing, we note Taylor essentially adopted her first statement. The principal allegations of Taylor's second statement, which discussed Appellant statements after the shooting, were corroborated by Grant's wife's testimony. *See* N.T., 11/26/12, at 132-33; N.T., 11/28/12, at 111. With regard to Taylor's third statement, which provided evidence of Appellant's motive, the jury heard Taylor's explanation that detectives held her in custody for four days, threatened her, typed their own words into the transcription of the interview, and coerced her to sign the statement. The jury also heard Detective Jenkins' testimony denying such conduct.

Following our review of the record, we conclude that the reliability and veracity of Taylor's statement to police was an issue for the jury to resolve.

---

[11] As noted above, Taylor testified she was detained from December 29, 2008, to January 2, 2009.

The questions of reliability and credibility were thoroughly presented to jury and argued by the parties. That the jury rejected Taylor's allegations of coercion was not contrary to the weight of the evidence. *See Widmer*, 744 A.2d at 751-52. Furthermore, the jury's decision to credit Taylor's third statement as substantive evidence of motive does not shock the conscience. *See id.* Therefore, we decline to disturb the province of the jury to resolve the issues of fact and credibility before it.

As to Appellant's remaining contention that the trial evidence failed to establish more than his mere presence at the scene, our review again reveals no basis to disturb the jury's resolution of credibility and its findings of fact that Appellant promoted the robbery during which Decedent was killed. *See id.* Therefore, no relief is due.

Appellant, in his petition for post-submission communication, attached a petition for remand requesting that the trial court conduct an evidentiary hearing to consider newly discovered evidence. In support, he alleges that in three separate cases—*Commonwealth v. Pinkney*, 51-CR-001445602998-2009, *Commonwealth v. Drayton*, 51-CR-0013794-2009, and *Commonwealth v. Speaks*, MC-51-CR-0046522-2009—Detective Jenkins and Detective Pitts used improper interrogation techniques to obtain inculpatory statements. Appellant avers juries acquitted Pinkney and Speaks, and the trial court suppressed Drayton's confession based on the use of coercive tactics. Appellant's Pet. to Stay Proceedings & Remand to

Trial Court for Hearing on After Discovered Evidence ("Appellant's Pet. for Remand"), 10/21/14, at ¶¶ 13-17. He asserts he did not discover this potential new evidence until the November 6, 2013 publication of a news article during the pendency of this appeal. *Id.* at ¶¶ 10-18 & Ex. A (Mensah Dean, "Same 2 cops built 3 murder cases that fell apart," Phila. Daily News, 11/6/13 (available at http://articles.philly.com/2013-11-06/news/43696858_1_nafis-pinkney-nakeisha-finks-bad-cop) ("Daily News Article")). Appellant further asserts he intends to call the individuals discussed in the article, former defendants, Nefis Pinkney and Unique Drayton, as well as Shaquille Rainey, a relative of former defendant Speaks, who was interrogated by the detectives. He submits Pinkney, Drayton, and Rainey's testimony could establish Detectives Jenkins and Pitts' "habit" of using coercive interrogation techniques. *Id.* at ¶ 22 (citing Pa.R.E. 406).

Preliminarily, we observe Appellant's petition for remand, presented for the first time on appeal, is properly before this Court, since it alleges the discovery of facts during the pendency of this appeal. *See Commonwealth v. Castro*, 93 A.3d 818, 826 n.10 (Pa. 2014). Accordingly, we grant Appellant's petition for post-submission communication and review the attached petition for remand.

Given the procedural posture of this case, we follow the guidance, set forth in *Castro*, that Appellant "must at the very least, describe the evidence that will be presented at the hearing." *See Castro*, 93 A.3d at

827; **Commonwealth v. Perrin**, 108 A.3d 50, 53 (Pa. Super. 2015). "[T]he proposed new evidence must be producible and admissible." **Castro**, 93 A.3d at 825 (citation and some punctuation omitted). However, "newspaper articles generally do not constitute evidence, as they contain inadmissible hearsay." **Castro**, 93 A.3d at 825 n.11 (citations omitted). "[A]llegations in the media, whether true or false, are no more evidence than allegations in any other out-of-court situation." **Id.** at 825.

Instantly, Appellant attached a newspaper article and set forth a description of the evidence he intends to present at the requested evidentiary hearing, *i.e.*, testimony from Pinkney, Drayton, and Rainey regarding their interrogations by Detective Jenkins and Pitts. Appellant also attached transcripts in which Pinkney, Rainey, and Drayton testified to coercive conditions attendant to their interrogations, which included extended detentions, the lack of food and water, shackling, and physical attack. We conclude this meets the minimal requirement that a petition describe the alleged evidence he intends to present at the requested hearing.[12] **See Castro**, 93 A.3d at 827.

---

[12] We question whether, as Appellant suggests, testimony from Pickney, Rainey, and Drayton would be admissible at trial as "habit" under Pa.R.E. 406. **See Commonwealth v. Sanchez**, 848 A.2d 977 (Pa. Super. 2004) (noting two instances of forgery did not establish continuous and systematic conduct or establish frequent conduct involving a mundane matter). At this preliminary review of Appellant's petition for remand, however, we decline to deny relief based upon a rigorous analysis of the admissibility of his proffer. **See Castro**, 93 A.3d at 827.

The following principles govern our review of the merits of Appellant's request for an evidentiary hearing.

> To warrant relief, after-discovered evidence must meet a four-prong test: (1) the evidence could not have been obtained before the conclusion of the trial by reasonable diligence; (2) the evidence is not merely corroborative or cumulative; (3) the evidence will not be used solely for purposes of impeachment; and (4) the evidence is of such a nature and character that a different outcome is likely. At an evidentiary hearing, an appellant must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted.

*Commonwealth v. Rivera*, 939 A.2d 355, 359 (Pa. Super. 2007) (citations omitted).

In *Rivera*, this Court determined that a newspaper article—which was published during the pendency of the defendant's appeal—disclosing the arrest of a Commonwealth's laboratory technician for stealing evidence, constituted a claim of newly discovered evidence warranting an evidentiary hearing. *Id.* at 357. The *Rivera* Court reasoned:

> [W]e find it unlikely that [the defendant] could have discovered [the technician's] alleged criminal activities before his trial ended in October of 2005. Consequently, this after-discovered evidence **is neither corroborative nor cumulative since at no time was the veracity of [the technician's] testimony questioned at trial**; to the contrary, both the [defendant] and the prosecution stipulated that [the technician] would state at court that the bag recovered in relation to this particular crime contained 137.5 grams of cocaine. Who knows whether this was or was not a truthful rendition of her "so-called" expert opinion. Moreover, the after-discovered evidence does much more than simply impeach the testimony of [technician], it calls into serious question the type and

> amount of drug upon which [the defendant's] conviction and sentence is based.

*Id.* at 359 (citation omitted) (emphasis added).

Instantly, Appellant's proffer is, in many respects, similar to **Rivera**. Appellant raises an inference of repeated official misconduct implicating fundamental fairness. Moreover, the nature of Appellant's allegations regarding the treatment of Taylor, as well as the attendant lack of policies addressing the possibility of abuse during interrogations and interviews is troubling.[13] Nevertheless, our review reveals significant legal distinctions between the instant case and **Rivera**.

As discussed above, the reliability and accuracy of Taylor's statements were presented to the jury, with Taylor alleging the use of coercive tactics by Detectives Jenkins and Pitts, and Detective Jenkins denying Taylor's allegations. Appellant had ample opportunity to develop the allegations of abuse through cross-examination of Taylor and Detective Jenkins. Thus, we are constrained to conclude that Appellant's proffer of evidence that Pinkney, Speaks, Drayton alleged or suffered similar abuse as Taylor would be cumulative of the evidence presented at trial. **See id.** at 359 (noting, in **Rivera**, that technician's opinion was not challenged at time of trial).

---

[13] We note the Philadelphia Police Department has sought to change its policies regarding interview/interrogation techniques. David Gambacorta, "Philly police to adopt sweeping interrogation reforms come Jan. 1," Phila. Daily News, 12/20/13 (available at http://articles.philly.com/2013-12-20/news/45381242_1_detectives-new-policy-aclu).

Moreover, under the circumstances of this case, the proffer would be offered to bolster Taylor's testimony while impeaching Jenkins' testimony. Furthermore, to the extent Appellant seeks discovery of Internal Affairs reports, such a request for additional information does not establish his right to an evidentiary hearing. Thus, we are compelled to conclude Appellant's proffers do not merit a further evidentiary hearing. Accordingly, we deny Appellant's petition for remand.

Lastly, although not raised by the parties, we observe the trial court sentenced Appellant to a term of life imprisonment for second-degree murder and five to ten years' imprisonment for robbery. It is well settled that we may raise legality of sentence issues *sua sponte*. ***Commonwealth v. Tanner***, 61 A.3d 1043, 1046 (Pa. Super. 2013).

We note there is a common law history requiring robbery be merged with second-degree murder at sentencing. ***See id.*** (overruling ***Commonwealth v. Sparrow***, 370 A.2d 712 (Pa. 1977), and holding robbery is "constituent offense" of second-degree murder and thus "same offense" under double jeopardy test in ***Blockburger v. United States***, 284 U.S. 299 (1932)). However, the General Assembly, effective February 2003, created a statutory merger provision, which states, "No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense." 42 Pa.C.S. § 9765. Section 9765 reflects a

"strict elements approach," which "preclude[s] the courts of this Commonwealth from merging sentences for two offenses that are based on a single criminal act unless all of the statutory elements of one of the offenses are included in the statutory elements of the other." *Commonwealth v. Baldwin*, 985 A.2d 830, (Pa. 2009); *Commonwealth v. Quintua*, 56 A.3d 399, 402 (Pa. Super. 2012).

> In *Baldwin*, the Pennsylvania Supreme Court observed:
>
> Labels, such as "pure elements test" and "strict elements approach," have often led to greater mischief. For example, in *Whalen* [*v. United States*, 445 U.S. 684, (1980)], the United States Supreme Court struggled to determine whether a felony murder conviction merged with a conviction for the underlying felony where a felony murder conviction could hinge on any one of six enumerated offenses. **A "strict elements approach," which does not consider the offenses as charged and proven in each particular case, invariably leads to the conclusion that the crimes do not merge.** Nevertheless, a majority of the Court, relying on *Blockburger* (often used synonymously with "strict elements approach") held that the two convictions merged for sentencing. In this regard, the Court demonstrated a recognition that examination of the elements of the crimes as charged is sometimes necessary, especially when dealing with an offense that can be proven in alternate ways.

*Baldwin*, 985 A.2d at 837 n.6 (emphasis added).

It is clear Section 9765 has disrupted at least some of the prior decisional law regarding merger. *See Commonwealth v. Quintua*, 56 A.3d at 402 (holding burglary and criminal trespass do not merge). However, *Tarver*'s analysis was based on a strict elements approach rooted in

**Blockburger**, which, in turn, reflects principles similar to those adopted by the General Assembly when enacting Section 9765. **See Baldwin**, 985 A.2d at 837 n.6. Thus, **Tarver** remains binding authority on this Court. Accordingly, we agree with the parties that Appellant's conviction for murder of the second degree and robbery merge, and vacate the sentence for robbery. Because our decision does not affect the aggregate sentence, a remand for resentencing is unnecessary. **See Commonwealth v. Henderson**, 938 A.2d 1063, 1067-68 (Pa. Super. 2007).

Judgment of sentence affirmed in part. Sentence for robbery vacated.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/8/2015