J-S02022-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
DANIEL GIDDINGS, :
:
Appellant. : No. 701 EDA 2017

Appeal from the Judgment of Sentence, March 16, 2015,
in the Court of Common Pleas of Philadelphia County,
Criminal Division at No(s): CP-51-CR-0008546-2013.

BEFORE: GANTMAN, P.J.E., KUNSELMAN, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY KUNSELMAN, J.: **FILED APRIL 23, 2019**

Daniel Giddings appeals, *nunc pro tunc*, from the judgment of sentence imposed after a jury convicted him of burglary, conspiracy, criminal trespass, and two counts of criminal attempt.[1] After careful review, we affirm.

The trial court summarized the testimony presented by the Commonwealth at trial as follows:

> At trial, the Commonwealth first presented the testimony of Philadelphia Police Officer Daniel Loesch. Officer Loesch testified that on March 20, 2013 at approximately 11:46 a.m., he was on routine patrol with his partner, Officer [Ryan] Saunders, when he received a radio call for a burglary in progress at 2031 North 32nd Street. The officers, who were approximately two blocks away, responded to that address within 20 to 30 seconds. Upon arrival, Officer Loesch immediately observed a green Ford pickup truck

---

[1] 18 Pa.C.S.A. §§ 3502(a)(2), 903, 3503(a)(1)(i), and 901, respectively.

parked in front of the residence. In the bed of the truck, there were numerous items, including a refrigerator, stove, radiator and several pipes. The officers approached the residence, which had its front door ajar, and Officer Loesch immediately observed two men trying to carry a bathtub out the front door; a third man behind them was carrying a radiator. Officer Loesch ordered the men to stop, and asked them to produce identification to determine if any of them lived there. "[N]one of the men could produce . . . any kind of credentials that they lived at the residence."

Officer Loesch testified that, shortly thereafter, the owner of the property, Eric Williams, arrived at the scene and stated that none of the males had permission to be inside. At that point, the three males - - [Giddings], Co-Defendant Abdul Bailey, and Benjamin Gardner - - were placed under arrest. [Gardner pled guilty to burglary and conspiracy prior to trial.] Officer Loesch also was presented with various photographs taken at the scene which depicted, and he described, the numerous items of property stripped from the residence[.]

Philadelphia Police Officer Ryan Saunders testified next for the Commonwealth. Officer Saunders testified that, on March 20, 2013, he and his partner, Officer Loesch, responded to a burglary in progress call at 2031 North 32nd Street. There, they encountered two males who were trying to remove a cast iron bathtub from the residence, and a third male carrying a large heater. The males, later identified as [Giddings], Co-Defendant Bailey and Benjamin Gardner, provided information indicating that they did not live at the premises.

Next, the Commonwealth called Eric Williams to the stand. Mr. Williams testified that he was the owner of the home at issue, which his father transferred to him via deed in 1987. Prior to that, his father had owned the home for quite a few years. Mr. Williams testified that both he and his father had rented the home to Vito Bueano and his family for many years. Commencing in late 2011, however, Mr. Bueano began falling back on his rental payments, prompting Mr. Williams to issue three successive late rent notices[.] Mr. Williams thereafter issued Mr. Bueano a 60-day notice to vacate the premises, no later than May 18,

2012. Mr. Bueano moved out of the home on May 1, 2012, at which time he surrendered all the keys to the residence.

After Mr. Bueno moved out, Mr. Williams started renovating the property to turn it into a duplex. Mr. Williams, who worked as a barber, visited the home every couple of weeks to perform the renovations. In fact, he had been at the home at nine o'clock in the morning on March 20, 2013 - - the day of the burglary - - to drop off some recessed lighting prior to work. Upon receiving a telephone call from his father later that day, he returned to the home to find several police cars and a pickup truck containing numerous items, in addition to items on the sidewalk and in the front living room, all of which had been removed from his home. . . . Mr. Williams also testified that he did not give anyone permission to remove the items from his property, and did not know/had never before seen [Giddings], Co-Defendant Bailey or Benjamin Gardner.

Finally, Mr. Williams testified that, when he left the property on the morning of March 20, he locked the front door and there was no damage to it. When he returned later that day, however, he found that his front door had been broken into: "where the doorknob would be, it was a hole, and the outside of it was completely missing. . . . There was a hole and you could see straight through. And the wood that separates the handle from the outside of the door, it as [a] complete hole, like it had been torn out."

Trial Court Opinion, 12/20/17, at 2-4 (citations and footnotes omitted).

The trial court also summarized the case presented by the defense as follows:

For his case in chief, [Giddings] presented the testimony of his wife, Raina Giddings, and friend, Benjamin Gardner. Mrs. Giddings testified that she was the owner of the green Ford pickup truck that contained the items from 2031 North 32nd Street. She testified that on the previous night, March 19th, [Giddings] had told her that a friend would be coming by to "rent" her truck. She explained that she typically rented her truck out to friends for $10. At approximately 8:30 p.m. that evening, a man she had never met before,

"Ben", came to her door; the man, later identified as Benjamin Gardner, was alone at the time. She handed Ben the keys to her truck, bud did not receive any rental money because, in her words, "I felt that was between him and [Giddings]." Nor did she obtain any paperwork or documentation from Ben. She simply handed him the keys "and that was that". [While Mrs. Giddings never had previously met Gardner, she was acquainted with Co-Defendant Bailey as her husband's friend].

Finally, [Giddings] called Benjamin Gardner to the stand. Mr. Gardner testified that on March 20, 2013, he had been living at 2031 North 32nd Street for "about six months". He had been living with Vito Bueano - - a friend since childhood - - but Vito had moved out "about a month prior". Before living there, Mr. Gardner had lived many years at 2022 North 32nd Street (right across the street) with his grandmother. Although he was not working at the time, he claimed the he was paying Vito $300 per month to live there through his Social Security check. [Although Gardner produced a letter from the Social Security Administration addressed to him at 2031 North 32nd Street, it was dated July 3, 2103, more than three months after the burglary for which he and Giddings were charged].

Mr. Gardner admitted to removing all the items from the residence. He claimed that he was planning to so some remodeling in the following month. Although he admittedly did not have money to pay for the remodeling, he was planning to settle a lawsuit from a car accident, and fund the project with those proceeds. On March 19, 2013, a friend named "Rich" drove him to [Giddings'] house, where he rented the pickup truck from [Giddings'] wife. He then commenced removing the items from 2031 North 32nd Street with two friends, [a different man named] Rich and Bobby. Mr. Gardner admitted, however, that [Giddings] was standing right next to him and the bathtub when police arrived, and Co-Defendant Bailey, who is Mr. Gardner's cousin, also was present.

Later on in his testimony, but still on direct examination, Mr. Gardner's story started to change. He claimed that it was Vito Bueano who was doing the renovations - - even though Vito did not live there anymore - - and Vito wanted to "start scrapping it." When Vito made these plans known

- 4 -

to Mr. Gardner, Mr. Gardner volunteered to do the "scrapping" for him. Mr. Gardner also admitted to pleading guilty to burglary and conspiracy for the events at issue, and that, in addition to the burglary conviction, he had been convicted of other *crimen falsi* offenses in 2010.

On cross-examination, Mr. Gardner admitted that he never met the landlord in the six months that he claimed to live [on] the first floor, front living room of the residence, and further, that he told police at the scene, "I had nothing in the house to show that I lived there." Additionally, Mr. Gardner admitted that, even though he claimed to be actively living there, he removed "two bathtubs, two bath sinks, a stove, kitchen sinks, a refrigerator and eight radiators, six ceiling lights and copper and iron pipes" - - *i.e.*, the very items which made the residence habitable.

Trial Court Opinion, 12/20/17, at 4-6 (citations and footnotes omitted).

Based upon the above evidence, the jury convicted Giddings on all charges. On March 16, 2015, the trial court sentenced Giddings to an aggregate term of two to eight years of incarceration, followed by five years of probation. Giddings filed neither a post-sentence motion nor an appeal to this Court. On August 3, 2015, he filed a *pro se* post-conviction petition, which sought to reinstate his direct appeal rights *nunc pro tunc*. Following the appointment of new counsel, the parties stipulated to the reinstatement of Giddings' direct appeal rights. This timely appeal followed. Both the trial court and Giddings have complied with Pa.R.A.P. 1925.

In this appeal, Giddings phrases his sole issue as "Whether the evidence submitted was insufficient as a matter of law to convict [him] of Burglary (F1), Conspiracy (F1), Criminal Trespass (F2) and related charges." Giddings' Brief at 6 (footnotes omitted). According to Giddings, the evidence presented

against him "was wholly insufficient to prove beyond a reasonable doubt that [he] had the necessary *mens rea* to commit the crimes of Burglary, Conspiracy, and Criminal Trespass. He then continues:

> Evidence was admitted proving conclusively that Gardner appeared to reside at 2031 North 32nd Street. Without knowing Williams, [the true owner of the property,] [Giddings] had no reason not to believe that Gardner was licensed to be at the property, and was able to extend that license to [Giddings]. Furthermore, [Giddings'] calm composure, compliance, and no attempt to flee the scene once the police arrived indicate that he did not believe he was committing a crime. Therefore, the record is completely devoid of any indication that [Giddings] intentionally or knowingly entered 2031 North 32nd Street with the intent to commit a crime, let alone that he conspired to do so, or even knew that a crime was being committed at that property.

Giddings' Brief at 12.

When evaluating a sufficiency of the evidence claim, this Court is limited to considering

> the evidence admitted at trial and all reasonable inferences therefrom in the light most favorable to the Commonwealth as the verdict winner. An appellate court may not substitute its judgment for that of the fact-finder; the critical inquiry is not whether the court believes the evidence established guilt beyond a reasonable doubt, but whether the evidence believed by the fact-finder was sufficient to support the verdict. The proper question is not whether the defendant's contentions are supported by the record, but whether the verdict is so supported.

***Commonwealth v. Sinnott***, 30 A.3d 1105, 1110 (Pa. 2011). Moreover, "the [trier] of fact, while passing upon the credibility of the witnesses and the

weight of the evidence produced, is free to believe all, part or none of the evidence." ***Commonwealth v. Hansley***, 24 A.3d 410, 416 (Pa. Super. 2011) (citation omitted).

We first address Giddings' sufficiency claim as to his burglary conviction. "A person is guilty of burglary if he or she enters a building or occupied structure with the intent to commit a crime therein, unless he or she is licensed or privileged to enter. 18 Pa.C.S.A. § 3502(a)." ***Commonwealth v. Lambert***, 795 A.2d 1010, 1015 (Pa. Super. 2002). In ***Lambert***, we explained the jury may find the *mens rea* for burglary solely through circumstantial evidence.

> The intent to commit a crime after entry ***may be inferred*** from the circumstances surrounding the incident. While this intent may be inferred from actions as well as words, the actions must bear a reasonable relation to the commission of a crime. Once one has entered a private residence by criminal means, we can infer that the person intended a criminal purpose based upon the totality of the circumstances. The Commonwealth is not required to allege or prove what particular crime a defendant intended to commit after his forcible entry into the private residence.

***Id***. at 1022 (citations omitted).

Giddings contended at trial, and maintains in this appeal, that he had no knowledge that he was participating in a burglary. According to Giddings, he believed Gardner had authority to be on the property and to remove the items at issue. Therefore, he claims his criminal acts stemmed from a mistake of fact. In support of his contention, Giddings relies on this Court's previous decisions in ***Commonwealth v. Namack***, 663 A.2d 191 (Pa. Super. 1995),

and ***Commonwealth v. Muniem***, 303 A.2d 528 (Pa. Super. 1973). In both cases this Court reversed the defendants' convictions because the evidence established a bona fide, reasonable mistake of fact, which, under the circumstances, negated the element of criminal intent.

In ***Namack***, this Court reversed the defendant's conviction for defiant trespass for using a trail through woods on a neighbor's property because he did so based on any attorney's advice that he possessed a prescriptive easement over the property. In ***Muniem***, this Court reversed the defendant's burglary conviction after he was observed walking to out of a vacant warehouse's half-open door; Muniem ran when the police arrived, but he had nothing in his possession. In reversing, this Court explained:

> In the instant case, the only evidence produced against appellant is his presence, perhaps as a trespasser, in a vacant building in daylight about noontime. When found by the police, he was walking to the open door by which he testified that he entered the building. The owner of the building testified that nothing was missing and there was no evidence of a [forcible] entry, or possession of any burglary tools, other tools or anything else.
>
> Each case must stand on its own facts in determining whether the Commonwealth has sustained its burden of proof. At best, the evidence of the Commonwealth may give rise to suspicion and conjecture of guilt but most certainly does not have such volume and quality capable of reasonably and naturally justifying an inference of a willful and malicious entry into a building with the intent to commit a felony so as to overcome the presumption of innocence and establish guilt beyond a reasonable doubt of the crime of burglary.

***Muniem***, 303 A.2d at 529.

- 8 -

Although Giddings claims that his case is analogous to **Muniem**, his case is readily distinguishable. As stated above, "each case must stand on its own facts," and the facts in Giddings' case are much different from those presented in **Muniem**. Here, police found Giddings coming out of an empty house that had been broken into, carrying a household fixture, unlike, Muniem, who had no stolen items, but merely was trespassing.

The trial court rejected Giddings' sufficiency challenge as a matter of credibility for the jury to determine. The court reasoned:

> [Giddings'] contention that Mr. Gardner and, by extension, [Giddings], had permission to be present is strictly a matter of credibility particularly vis-à-vis Mr. Williams' unequivocal testimony and documentary evidence to the contrary. As such, [Giddings'] contention regarding alleged permission goes to the weight, and not the sufficiency, of the evidence. In that regard, it is axiomatic that the jury is free to believe all, part or none of the evidence.

Trial Court Opinion, 12/20/17, at 10 (citation omitted).

We agree. **Hansley**, **supra**. Giddings and the Commonwealth presented two different versions of the same incident, and the jury obviously found the Commonwealth's evidence and arguments more credible and persuasive. As the trial court rightly acknowledged, "there simply exists no basis for invading [the jury's] province" where it chooses to believe one witness' testimony over another. **Id**. Thus, Giddings' sufficiency challenge to his burglary conviction fails.

This same adverse credibility determination by the jury also renders meritless Giddings' claims that the Commonwealth failed to present sufficient

evidence that he had the requisite *mens rea* necessary to convict him for conspiracy and criminal trespass. A conviction for conspiracy requires proof of a shared criminal intent. ***Commonwealth v. Knox***, 50 A.3d 749, 755 (Pa. Super. 2012) (citation omitted). A person commits the crime of criminal trespass if, "knowing that he is not licensed or privileged to do so" he "enters, gains entry by subterfuge or surreptitiously remains in any building or occupied structure[.]" 18 Pa.C.S.A. § 3503(a)(1).

After hearing the evidence, the jury found Giddings guilty of both of these charges. Giddings' claim that the jury "would have had to apply a strict liability standard" in order to convict him is meritless. As noted above, the jury chose to believe the Commonwealth's witnesses and their version of the case rather than the testimony presented by Giddings. ***See Commonwealth v. Montini***, 712 A.2d 761 767-68 (Pa. Super. 1998) (stating "a mere conflict in the testimony of the witnesses does not render the evidence insufficient because it is within the province of the factfinder to determine the weight to be given to the testimony and to believe all, part, or none of the evidence").

Moreover, circumstantial evidence indicated Giddings was well aware that Gardner did not have authority to remove the items from this home. Given the relationship of these men, the broken front door, and the type of items being removed, a jury could infer that the Commonwealth proved Giddings had the requisite *mens rea* to be convicted of these crimes.

In sum, viewing the evidence and all reasonable inferences drawn in favor of the Commonwealth, we find that the evidence was sufficient for the

jury to conclude that Giddings possessed the requisite *mens rea* for the crimes of which he was convicted. Thus, there was sufficient evidence to sustain Giddings' convictions for burglary, conspiracy, and criminal trespass.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/23/19